UNITED STATES DISTRICT COURT
SOUTHERN DISTRTICT OF NEW YORK

| | |
|---|---|
| HAROLD R. DILL, EDWARD M. APPLEBY and KARI GARBER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>Defendant. | Case No. 19 cv 10947 (KAF)<br><br>**AMENDED**<br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Harold R. Dill ("Dill"), Edward M. Appleby ("Appleby") and Kari Garber ("Garber) (collectively, "Plaintiffs"), individually and on behalf of the classes of all others similarly situated as defined below (the "Classes"), by their undersigned counsel, for their Class Action Complaint against defendant JPMorgan Chase Bank, N.A. ("JPM"), allege as follows based on (i) personal knowledge, (ii) the investigation of counsel, and (iii) information and belief:

## I.    SUMMARY OF THE ACTION

1.    This action seeks redress based on JPM's systematic breach of its obligations under federal law and the laws of various states regarding tens of millions of dollars of abandoned property, consisting of funds for cashier's checks sold by JPM, which JPM improperly held for its own use and benefit, and then either kept or wrongfully delivered to the

1

State of Ohio (where JPM's home office is located) rather than delivering the funds to the states where the cashier's checks were purchased, as required by law.   In the process, JPM knowingly and deliberately failed to provide – and, in fact, prevented – proper notice to the owners of the funds, which would have enabled the owners to claim the funds to which they were entitled.   As a result, tens of millions of dollars – and probably substantially more – rests in the possession of the State of Ohio (or some other state unknown to the owners of the funds), and/or is being improperly held and used by JPM for its own benefit, but rightfully belongs to Plaintiffs and the members of the proposed Classes, who continue to be deprived of those funds.

2.      Plaintiffs and the members of the Classes are the owners of the funds for the cashier's checks (the "Owners") because they are the payee on the cashier's checks ("Payee") or the purchaser ("Purchaser"), who paid the funds to JPM in order for JPM to issue the cashier's check; sometimes, the Purchaser and the Payee are the same individual or entity.[1]   The cashier's checks (the "Checks") were never negotiated (cashed), and no funds were ever paid by JPM on the Checks.   Thus, the Checks eventually became abandoned property subject to applicable state laws of escheatment and to 12 U.S.C. § 2503, the federal statute governing the priority of escheatment of written instruments like cashier's checks.

3.      JPM, like other banks, is required by the laws of the states in which it does business to deliver abandoned property in its possession subject to escheatment, including cashier's checks.   State law defines which abandoned property is subject to escheatment in a

---

[1] When a cashier's check is purchased, if the Purchaser is a deposit account holder, the funds are taken from the Purchaser's account and paid to JPM.   If the Purchaser is not a deposit account holder, the Purchaser pays the funds directly to JPM to issue the cashier's check.

3238030.2

given state; the applicable period after which specific categories of unclaimed property will be deemed abandoned in that state; and the procedures for escheating abandoned property, including giving notice to the owners of such property of the intended transfer, and reporting the property subject to escheatment to the relevant state.

4.        In addition, federal common law and 12 U.S.C. § 2503 establish priorities for determining which of several possible states is entitled to escheat the abandoned property held by an entity that, like JPM, does business in multiple states or holds property owned by out-of-state individuals.   Unlike other forms of abandoned property, which are subject to the federal common law priorities established by the United States Supreme Court in *Texas v. New Jersey*, 379 U.S. 674 (1965) for determining the state in which such property must be escheated, Congress enacted a federal statutory rule, 12 U.S.C. § 2503, to govern the priority among the states for escheatment of cashier's checks and other written instruments on which a bank is directly liable, to wit "any sum payable on a money order, traveler's check or other similar written instrument (other than a third party bank check) on which a banking or financial organization or business association is directly liable."

5.        Section 2503 provides the federal priority rule for the escheatment of cashier's checks, because a cashier's check is a "written instrument" on which a banking or financial organization is "directly liable" similar to a money order or a traveler's check.   Thus, 12 U.S.C. § 2503 requires banks holding funds for abandoned cashier's checks, in this case JPM, to deliver the funds – where the applicable states have laws requiring escheatment of abandoned cashier's checks – as follows: (i) if the books and records of the bank show the state in which the written

3238030.2

instrument was purchased, then to the state of purchase of the cashier's check; and (ii) if the books and records of the bank do not show the state in which the written instrument was purchased, then to the state of the principal place of business of the issuing entity.

6.      As discussed below, based on banking regulations, and, upon information and belief, JPM's own internal governance and operating procedures relating to cashier's checks, JPM knows the state of purchase of the Checks (including the branch at which the Checks were purchased),[2] as well as – at a minimum – the name and address of the Purchaser for any Check, who or which is typically a deposit account holder – and the serial number of the Checks.   In addition, JPM knows the name and, upon information and belief, often the address of the Payee on the Checks – and has access to the address and other identifying information for the Payee. In this case, the Checks were purchased in the following states: New York, Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kentucky, Louisiana, Michigan, Missouri, Nebraska, Nevada, New Jersey, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, Tennessee, Texas, Utah, Washington, West Virginia and Wisconsin (respectively, the "State of Purchase" or, collectively, the "States of Purchase"), *excluding the State of Ohio*, and were subject to the respective abandoned property laws of the States of Purchase.   All of the States of Purchase have abandoned property laws which provide for escheatment of abandoned cashier's checks (*see, e.g.*, § 3-57a(4) of Connecticut's Unclaimed Property Law; §§ 1511(a)(1) & 1513(a)(4) of California's Unclaimed Property Law; §717.105 of Florida's Disposition of Unclaimed Property

---

[2] JPM confirms this knowledge in its most recent 2018 escheatment report to the State of Ohio of cashier's checks subject to escheatment, listing the state of purchase of the cashier's checks.

3238030.2

Act; §§ 1026/15-201(3) and 15-306 of Illinois' Revised Uniform Unclaimed Property Act; § 46:30B-16 of New Jersey's Unclaimed Property Act; § 300(1)(c) of New York's Abandoned Property Law; and §§ 72.101 and 73.001 of the Texas Property Code).

7.      Accordingly, when the Checks remained outstanding after a certain period of time (known as the "Dormancy Period"), JPM was required to take certain steps: (i) to provide direct notice to the Owner of the funds that the funds existed and were available to claim, and of the intended transfer of the funds to the State of Purchase (and, in New York State, to provide additional publication notice); (ii) to turn the funds over to the Owner when the Owner made a claim in response to the notice; (iii) to file an annual report with the State of Purchase containing a complete and accurate list of the funds that were not claimed together with the name and address of the Owner; and (iv) to deliver to the State of Purchase each year all of the unclaimed funds.   Upon the filing of the annual report and the escheatment of the funds, each of the States of Purchase – as a matter of law or operating policy – also provides notice to the Owner of the unclaimed funds, enabling the Owners to claim the funds to which they are entitled.

8.      Notwithstanding that JPM knew the States of Purchase of the Checks and, as discussed below, the overwhelming majority of the Checks were not purchased in Ohio, JPM deliberately failed to comply with the requirements under the abandoned property laws of the States of Purchases and under 12 U.S.C. § 2503.   Instead, JPM improperly delivered all of the funds from the Checks to Ohio, where JPM's "home office" is located, which does not, under any circumstances, comport with Section 2503.[3]   This was not simply an error in interpreting

_____

3  In the unlikely event that JPM did not know the State of Purchase, then, pursuant to Section 2503, JPM was required to deliver the escheated funds to its *principal place of business*, which is New York.   *See, e.g., Excelsior*

abandoned property laws and the federal law on escheatment of cashier's checks; rather, this was and is purposeful and systematic conduct that provides a substantial economic benefit to JPM. Ohio's abandoned property laws – in contrast to many other states – are more financially favorable to banks, thus incentivizing JPM to follow the abandoned property laws of Ohio rather than the State of Purchase or even to the State of New York, where JPM's principal place of business is located (and also a State of Purchase).   First, unlike most other states (including at least the majority of the States of Purchase), Ohio exempts business-to-business transactions from escheatment, thus permitting banks like JPM to retain and use those funds indefinitely, rather than requiring the funds to be turned over to any state.   Ohio St. § 169.01(B)(2).   Second, Ohio permits banks like JPM to hold the abandoned funds for cashier's checks for five years before deeming them abandoned subject to escheatment, unlike most of the other states (including the majority of the States of Purchase) that deem cashier's checks abandoned and subject to escheatment after three years, thus allowing JPM to retain and make use of the funds for an two additional years.[4]   Ohio St. § 169.02(F).   Third, upon information and belief, Ohio does not require banks like JPM holding abandoned property to deliver the full amount of the funds (or did not until just recently), but rather, permitted the holder (JPM) to deliver only 10% of the funds, while retaining 90% of the abandoned funds to use – potentially indefinitely.   Ohio St. § 169.05(A).

9.    JPM has failed to comply with Section 2503 and the applicable abandoned property laws of the States of Purchase: (i) to provide required notice to Plaintiffs and each

_Funds, Inc. v. JP Morgan Chase, N.A._, 470 F.Supp.2d 312, 313 (SDNY 2006).

[4]  More than 77% of JPM's branch offices are in states with a three-year abandonment period, while fewer than 5% of its branch offices are in Ohio.

member of the Classes of the unclaimed funds for the Checks; (ii) to file the required annual

reports of unclaimed funds with the States of Purchase – let alone accurate reports; (iii) to make

payment of the funds for the Checks to Plaintiffs and the members of the Classes, which funds

JPM wrongly retained and continued to use, and/or has improperly delivered (in whole or in part)

to the State of Ohio; and (iv) in the case of Owners who could not be located by JPM to make

payment of the funds for the Checks, to deliver those funds (in conjunction with annual reporting

requirements) to the State of Purchase, so that the State of Purchase could provide additional

notice to, and make additional efforts to contact, Owners, so that they could claim the funds to

which the Owners were, and are, entitled.   By reporting and then delivering the funds subject to

escheatment only to Ohio, absent exceptional circumstances, the Owners of the funds will not be

notified of their entitlement to claim the funds.

10.    Accordingly, Plaintiffs and each of the members of the Classes are entitled to

recover the funds for the Checks owned by them and either improperly held by JPM or wrongly

delivered to the State of Ohio, plus interest for each year JPM did not pay the funds to the

Plaintiffs and the members of the Classes, together with the additional relief described below.

## II.    PARTIES

### A.  Plaintiffs

11.    Plaintiff Dill is a resident and citizen of the State of Connecticut.   Dill purchased

four Checks from JPM in or about December 2012 at JPM's bank branch in Darien, Connecticut

in the aggregate amount of $12,786.53, all of which were payable to Dill.[5]   Dill is thus the

---

[5] Dill purchased three checks in the amount of $3,000, and one check in the amount of $3,786.53.

Purchaser of and Payee on the Checks.   JPM delivered the funds for Dill's Checks to the State

of Ohio in 2018.   At no time did Dill receive notice that the funds for those Checks were to be

deemed abandoned by JPM or subject to escheatment.   Nor was Dill ever provided notice or the

opportunity by JPM to claim the funds or advise JPM of his interest in or right to the funds.

12.    Plaintiff Appleby is a resident and citizen of the State of California.   Appleby is

the Payee on several Checks, each in the amount of $10,000, issued by JPM in California in

approximately 2013 (or before), which Checks were purchased by Appleby from funds in one or

more of Appleby's JPM bank accounts or issued for Appleby from one or more of those JPM

accounts.   The Checks were never cashed.   JPM delivered the funds for these Checks to the

State of Ohio in 2018.   At no time did Appleby receive notice that the funds for were going to

be deemed abandoned by JPM or subject to escheatment; nor was Appleby ever provided notice

or the opportunity by JPM to claim the funds or advise JPM of his interest in or right to the

funds.

13.    Plaintiff Garber is a resident and citizen of the State of Florida.   Garber is the

Payee on and owner of a Check in the amount of $4,500, issued by JPM (to a third party

purchaser) at a JPM branch in the State of Florida on February 22, 2013.   The Check was never

cashed.   JPM reported the check to the State of Ohio as abandoned property owned by Garber

(of unknown address in the State of Florida) on October 31, 2018 and, on information and belief,

delivered all or a part of the $4,500 payable on the uncashed Check to the State of Ohio at that

time.   At no time did Garber receive notice that the Check was going to be deemed abandoned

by JPM or subject to escheatment (to Ohio or otherwise); nor was Garber ever provided notice or

3238030.2

the opportunity by JPM or any state authority to assert her continuing interest in the funds

payable on the Check or information that the funds payable on the check had been escheated to

the State of Ohio and could be redeemed from the State of Ohio.

### B. Defendant JPM

14.    At all times relevant hereto, JPM was a national bank, with its home office in the

State of Ohio, but its principal place of business in the State of New York, and with

approximately 5190 branch offices in multiple states, including the States of Purchase (and, in

particular, Connecticut and California).   JPM is a "banking organization," as defined in § 103(c)

of New York's Abandoned Property Law ("APL") and as defined by the abandoned property

laws of the States of Purchase.   JPM is a citizen of the State of Ohio, the domicile set forth in its

articles of association as a national bank given that it maintains its home office there.   Pursuant

to 28 U.S.C. §1332, JPM is also a citizen of New York, where it has its principal place of

business.

### III.    JURISDICTION AND VENUE

15.    This Court has personal jurisdiction over JPM, because it is a resident of New

York County in the Southern District of New York, has regularly conducted banking business in

New York County and State, including business with respect to a substantial amount of the

Checks and funds that are the subject of this action.

16.    Because 12 U.S.C. § 2503 obligated JPM to pay the funds of the Checks to the

States of Purchase rather than Ohio, and to otherwise comply with the laws of escheatment of the

3238030.2

States of Purchase, this action raises a federal question, and this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331.

17.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) (2) (A), because this case is a class action where the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and some of the Plaintiffs, and most members of the proposed Classes are citizens of states different from JPM.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), (b)(2) and (c)(2), and 18 U.S.C. § 1965, because JPM resides in, transacts business in, is found in, and a substantial part of the actions giving rise to this complaint took place within this District.   The Court has personal jurisdiction over JPM, which has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the conduct alleged herein throughout the United States, including in this District.   The conduct has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    FACTUAL BACKGROUND

### A.  The State of Purchase Controls Abandoned Cashier's Checks.

19.    JPM is required by the laws of the states in which it does business to deliver abandoned property in its possession subject to escheatment to those states.

20.     JPM's obligations derive from both state and federal law.   State law defines what abandoned property is subject to escheatment in a given state; the applicable period at which specified categories of unclaimed property will be deemed abandoned in each state; the procedures for escheating abandoned property; including giving notice to the Owners of such property of the intended transfer, and reporting the property subject to escheatment to each state.

21.     JPM has, at all times material hereto, had bank branches in the States of Purchase. The majority of the States of Purchase have a Dormancy Period of three years rather than five years like Ohio.[6]   Each State of Purchase requires annual reporting and escheatment by a date certain.

22.     As alleged herein, JPM maintains records of the branch or office where it sold each Check (the State of Purchase).   In addition, as alleged below, JPM, at a minimum, maintains records of the name and address of the Purchaser, the name and, often, the address of the Payee – and has access to the address and other identifying information for the payee. Further, JPM maintains records of the serial number of the Check, enabling it to track the Check internally and in the stream of commerce and, upon information and belief, to identify the branch in which the Check was sold.

23.     Thus, in accordance with the priorities established by 12 U.S.C. § 2503(1), at all times material hereto, JPM was required to deliver funds for any unclaimed, abandoned Checks

---

[6] Illinois amended its Dormancy Period to three years beginning January 1, 2018.

subject to escheatment to the State of Purchase at the defined Dormancy Period, which, in the majority of the States of Purchase, was and is three years.

24. In the event that the State of Purchase was unknown to JPM after reasonable diligence, JPM was required, pursuant to 12 U.S.C. § 2503(2), to deliver to New York – as its principal place of business – the amount of any funds for the Checks that remained uncashed and outstanding three years after issuance (or in certain instances, five years after issuance).

25. JPM breached its duties to Plaintiffs and the members of the Classes by failing to follow 12 U.S.C. § 2503 and the respective abandoned property laws of the States of Purchase, and by failing to deliver the funds subject to escheatment to the States of Purchase or, in the unlikely event that the State of Purchase was unknown, to New York, but rather, by delivering all of the funds it deemed subject to escheatment to the State of Ohio, which exempts all business-to-business cashier's checks and, upon information and belief, only requires 10% of the funds to be paid to Ohio by JPM.

**B.      JPM Failed to File Proper Reports and Give Required Notice Of Abandoned Cashier's Checks.**

26. At all times material hereto, each of the States of Purchase imposed duties on banking organizations doing business in that state, including JPM, to do three things with respect to abandoned property: (i) deliver to the state all abandoned property subject to escheatment in the bank's possession each year within a specified period of time; (ii) file a report with the state with their payments identifying all abandoned property subject to escheatment, providing the state certain information with respect to the abandoned property – including, in most instances,

the Owner's name and address, and certifying compliance with the state's escheatment requirements; and (iii) provide direct notice to the Owners of the abandoned property in that state of the intended transfer and, in New York, additional publication notice.

27.    For example, in Connecticut, at all times material hereto, C.G.S. § 3-65a(b) (under Connecticut's Unclaimed Property Law) required JPM (as the holder of abandoned property) to annually file a verified report – in conjunction with delivering the abandoned property to Connecticut – setting forth: (1) the name, if known, and last-known address, if any, of each person appearing to be the owner of such property; … (3) the nature and identifying number, if any, or description of the property and the amount appearing from the records to be due except that the holder shall report in the aggregate items having a value of less than fifty dollars; (4) the date when the property became payable, demandable or returnable and the date of the last transaction with the owner with respect to the property; (5) if the holder is a successor to other holders, or if the holder has changed the holder's name, all prior known names and addresses of each holder of the property; and (6) such other information as the Treasurer may require.

28.    At all material times, the other States of Purchase had similar reporting requirements. *See, e.g.,* CA Code of Civil Procedure §1530; FL Stat. §717.117; 765 ILCS 1026/15-401 - 403; N.J.S.A. §§46:30B-46, 46:30B-47, 46:30B-49; New York's Abandoned Property Law § 303.2; TX Prop Code § 74.101.

29.    In addition, at all material times in Connecticut, C.G.S. § 3-65a(a) required that, "within one year before a presumption of abandonment is to take effect … the holder shall notify

the owner [of the property], by first class mail directed to the owner's last-known address, that evidence of interest must be indicated as required … or such property will be transferred to the Treasurer and will be subject to escheat to the state."

30.     At all times material hereto, the other States of Purchase similarly required JPM to give notice by mail to the owners of property to be abandoned by JPM.   For example:

(i)     Section 1513.5 of California's Unclaimed Property Law provides that the holder of an instrument to be abandoned shall give notice either (1) not less than two years nor more than two and a half years after the date of last activity by, or communication with, the owner, or (2) not less than six (6) months nor more than twelve (12) months prior to the time such asset will become reportable to the Controller for California.

(ii)     Section 717.117(4) of the Florida Statutes provides that "[h]olders of inactive accounts having a value of $50 or more shall use due diligence to locate apparent owners.   Not more than 120 days and not less than 60 days prior to filing the report required by this section, the holder in possession of property presumed unclaimed and subject to custody as unclaimed property under this chapter shall send written notice to the apparent owner at the apparent owner's last known address informing the apparent owner that the holder is in possession of property subject to this chapter."

3238030.2

(iii)    In New York, Section §1422 of New York's Abandoned Property Law required JPM to "send, not less than ninety days prior to the applicable reporting date for such unclaimed property, a written notice by first-class mail to each person appearing to be the owner of property listed in a report of abandoned property required to be filed under the provisions of this chapter, at the address of the owner as it appears on the books and records of the holder; provided, however, that the foregoing requirements shall not apply where (a) the holder does not have an address for the owner; or (b) the holder can demonstrate that the only address that the holder has pertaining to the owner is not the current address of the owner."[7]

(iv)    Section 74.1011 of the Texas Property Code provides the holder of an instrument to be abandoned shall "on or before the following May 1, mail to the last known address of the known owner written notice stating that: (1) the holder is holding the property; and (2) the holder may be required to deliver the property to the comptroller on or before July 1 if the property is not claimed.

*See also, e.g.,* § 15-501(a) of Illinois' Revised Unclaimed Property Act; §46:30B-50 of New

---

[7] Section §302 of New York's Abandoned Property Law also required JPM to "publish[], on or before the first day of September in each year, a notice entitled: "NOTICE OF NAMES OF PERSONS APPEARING AS OWNERS OF CERTAIN UNCLAIMED PROPERTY HELD BY (name of banking organization)" and such notice "shall be published once in at least one newspaper published in the city or village where such abandoned property is payable, provided, however, that if such abandoned property is payable in the city of New York, such publication shall be in a newspaper published in the county where such abandoned property is payable" and "shall set the names and last-known addresses, which were in such report, of all persons appearing to be entitled to any such abandoned property amounting to fifty dollars or more; provided, however, that with the consent of the state comptroller the name and last-known address of any person may be omitted from such notice where special circumstances make it desirable that such information be withheld. Such names shall be listed in alphabetical order."

3238030.2

Jersey's Uniform Unclaimed Property Act.

31.     JPM breached the laws of the States of Purchase by failing (i) to provide notice to the Owners of the funds, (ii) to file the required annual reports in the States of Purchase (or, alternatively, filing false negative reports with the States of Purchase in connection with the Checks), and (iii) to deliver the funds subject to escheatment to the States of Purchase.   JPM thus breached these duties to Plaintiffs and the members of the Classes by instead filing reports of the unclaimed funds with Ohio, delivering the unclaimed funds to Ohio and only providing notice, if any notice was provided at all, in the State of Ohio rather than in the States of Purchase.

32.     As a result of JPM's breach of these duties, JPM caused damages to Plaintiffs and the members of the Classes by depriving them of required notice and the use of the funds of uncashed Checks and the interest thereon.

**C.     JPM's Conduct is Intentional and in Direct with JPM's Internal Controls and Procedures.**

33.     JPM maintains records of the Purchaser of the Checks it sold, including the name and address, and maintains the name and, in many instances, the address of the Payees.

34.     In addition, pursuant to federal anti-money laundering regulations, 31 C.F.R. § 1010.415, JPM maintained records of the name and address of the Purchaser of every Check between $3,000 and $10,000, as well as the serial number of the instrument; and, for Purchasers

who are not deposit account holders, JPM maintained the Purchaser's date of birth and social security number.[8]

35.    Upon information and belief, JPM maintains internal records of the date of purchase of *all* Checks and the branch at which the checks were purchased – as well as other identifying information such as names, addresses and serial numbers of the Checks.

36.    Further, the Purchaser knows the name of the Payee and can provide additional identifying information, including, without limitation, the address or location in the unlikely event that JPM does not have access to this information.

37.    At all times material hereto, JPM maintained an internal business function and staff with designated responsibility for complying with JPM's obligations under the respective abandoned property and escheatment laws, including its obligations to deliver abandoned property by the States of Purchase.   Upon information and belief, the executives and other personnel in JPM's abandoned property business function have special training in escheatment laws, including, without limitation, the applicable state laws and the rules of priority established by 12 U.S.C. § 2503.

38.    At all times material hereto, executives in JPM's abandoned property business function and the personnel who reported to them have been responsible for complying with the escheatment laws of various states, including but not limited to, (i) causing JPM to identify

---

[8] For Checks over $10,000, JPM maintained records of the name and address, account number, and social security or taxpayer identification number of any person or entity on whose behalf such transaction is to be effectuated. *See*, *e.g.*, 31 C.F.R. §§ 1010.311 and 1010.312.

abandoned property in its possession subject to escheatment; (ii) complying with applicable notice laws; (iii) preparing complete and accurate annual reports and filing them in the proper State and certifying to the property in JPM's possession subject to escheatment in each State; and (iv) causing JPM to deliver abandoned property subject to escheatment in the proper State and in accordance with JPM's annual report.

39.    JPM's annual escheatment reports to the States of Purchase must be signed under oath and are material to the state's verification of JPM's annual compliance with each state's abandoned property laws, and are relied upon by the officers of each state to verify that JPM has complied with its obligations under that state's escheatment law, including its obligation to deliver abandoned funds for cashier's checks and give proper notice in accordance with the requirements of applicable laws.

40.    JPM has benefitted and continues to benefit by employing business strategies to minimize its obligations to deliver the funds subject to escheatment and to enable it to retain possession – and the benefit of – abandoned property as long as possible: In some cases, for an additional two years, in other cases (business-to-business transactions), indefinitely, and, in many if not most cases, to retain at least 90% of the funds subject to escheatment.

41.    JPM's conduct was not simply an error in interpreting abandoned property laws; rather, this is purposeful and systematic conduct that provides tangible economic benefits to JPM because Ohio's abandoned property laws are generally more financially favorable to banks than the laws of other states, thus incentivizing JPM to improperly hold and then deliver property subject to escheatment to Ohio rather than the States of Purchase.   First, unlike most other

18

states, including at least the majority of the States of Purchase, Ohio exempts business-to-business transactions from escheatment, thus permitting banks like JPM to retain and use those funds indefinitely.[9]   Ohio St. § 169.01(B)(2).   Second, Ohio permits banks like JPM to hold the abandoned funds for cashier's checks for five years before deeming them abandoned and subject to escheatment, unlike most other states that deem the cashier's checks abandoned and subject to escheatment after three years, thus allowing JPM to retain and make use of the funds for two additional years.[10]  Ohio St. § 169.02(F).   Third, upon information and belief, Ohio does not require banks like JPM holding abandoned property to deliver the full amount of the funds (or did not until just recently), but rather, permitted the holder (JPM) to deliver only 10% of the funds, while retaining 90% of the abandoned funds to use – potentially indefinitely.   Ohio St. § 169.05(A).

42.     Further evidencing JPM's intentional conduct is that fact that it is not even complying with Ohio's escheatment laws concerning the Checks, which provide that, "if there no address of record for the owner or other person entitled to the funds, such address is presumed to be the address where the instrument was certified or issued."   *See* Ohio St. § 169.02(F).   Thus, even under Ohio law, the Checks should escheat not to Ohio but instead to the States of Purchase, because that is where the Checks were "issued."   And, pursuant to Ohio St. § 169.04,

---

[9]  Illinois eliminated the business-to-business exemption as of 1/1/2018, which is applied retroactively.

[10]  In addition, JPM is further gaining an advantage by escheating substantial sums to Ohio, its domicile, which funds likely will remain unclaimed given that the vast majority of the Owners of the funds will never receive notice, thus permitting Ohio the use of at least a portion of the funds indefinitely.   Only recently, beginning with funds escheated in connection with Checks in 2018, has Ohio transferred funds to *certain* states (though not all States of Purchase), because JPM has identified the State of Purchase in the 2018 escheatment report to Ohio.   Again, however, JPM never provided direct notice to any of the Owners of the funds as required under the respective State of Purchase abandoned property laws.

with respect to unclaimed property held for or owed "to an owner whose last known address is in another state by a holder who is subject to the jurisdiction of that state, the funds will not be unclaimed funds in [Ohio] and subject to [the Ohio Unclaimed Property Act]."   Accordingly, Ohio law mandates that for any unclaimed cashier's checks not purchased in Ohio, those checks are deemed subject to the laws of the actual States of purchase, and Ohio escheatment does not, on its face, apply to such checks.   Defendant JPM's invocation of Ohio escheatment law with respect to the unclaimed cashier's checks purchased in other States that it is holding is, thus, not only contrary to 12 U.S.C. § 2503, but is lacking in any basis under Ohio law and is knowingly false.

43.    Annually, JPM has tens of millions of dollars of cashier's checks, including the Checks, which remain uncashed and outstanding for more than three years from the date of issuance.

44.    The Checks are generally purchased at JPM's bank branches throughout the country.   Of JPM's more than 5,600 bank branches, fewer than 270 (approximately 5%) are located in Ohio.   Pursuant to 12 U.S.C. § 2503 and Ohio's escheatment laws pertaining to cashier's checks do not apply to cashier's checks purchased from JPM's branches in states other than Ohio, including the Checks in the States of Purchase.

45.    Nonetheless, in order to retain the benefit from tens of millions of dollars in abandoned cashier's checks for an additional two years, and indefinitely for business-to-business transactions, JPM has – since at least 2012 (and, upon information and belief, in years prior thereto as well), and continuing to date – improperly and purposefully treated the funds for the

3238030.2

Checks as property subject to Ohio's abandoned property laws (for all cashier's checks), and applied Ohio's five-year waiting period to over 65,000 abandoned cashier's checks, including the Checks, totaling over $115.98 million in uncashed funds, before delivering the funds for those cashier's checks to the State of Ohio, even though the overwhelming majority of those cashier's checks were purchased in states other than Ohio and such states have their own escheatment laws, including the Checks purchased in the States of Purchase.[11]

46.    JPM did this even though JPM knew or it is extremely likely that JPM did know from its own records the State of Purchase of each Check.    Indeed, even in the unlikely event JPM was unable to determine the State of Purchase, Section 2503 required JPM to escheat the funds for the Checks to the State of New York, because that was the state of its principal place of business, which would at a minimum have provided the New York Purchase Subclass (defined below) with notice and the ability to claim the funds.

**D.    JPM's Escheatment Reports Confirm that JPM Is Improperly and Falsely Applying Ohio Law.**

47.    JPM has not publicly reported where the abandoned cashier's checks escheated to Ohio in the years prior to 2018 were purchased.    That information is solely in defendant JPM's possession and is currently unavailable.    JPM's annual escheatment reports to the State of Ohio are, however, publically available and confirm that JPM is improperly and falsely applying Ohio law to the abandoned and unclaimed funds it holds for the Checks.

---

[11]    And, for business-to-business transactions, JPM has simply kept the funds for the cashier's checks.

48.     The annual escheatment reports filed by JPM with the State of Ohio list thousands of cashier's checks with no apparent connection to the State of Ohio, but which funds JPM delivered to Ohio each year since at least 2014, including hundreds – and often thousands – of cashier's checks in each annual Ohio report that were payable to businesses, governmental entities and individuals in States other than Ohio.   It is completely implausible that all of these cashier's checks purchased for such non-Ohio based payees were all purchased in Ohio. Further, JPM's conduct demonstrates that, for the period of at least 2012-2018, JPM failed to file the required annual reports in the States of Purchase or, alternatively, that JPM filed false negative reports in the States of Purchase in connection with the unclaimed cashier's checks.

49.     Plaintiff Dill purchased the Checks payable to himself from a JPM branch in Greenwich, Connecticut.   Plaintiff Appleby purchased the Checks payable to himself from a JPM branch in California.   Plaintiff Garber's Check was purchased and issued in the State of Florida.   JPM held the funds for Plaintiffs' Checks for at least five years, failed to provide notice and an opportunity to claim the funds to Plaintiffs in accordance with the abandoned property laws of the States of Connecticut, California and Florida, failed to deliver the funds to or file escheatment reports listing these Checks with the States of Connecticut, California and Florida, and delivered the funds payable on Plaintiffs' Checks to the State of Ohio in 2018.

50.     Plaintiffs' Checks are typical of JPM's custom and practice, as JPM has engaged in uniform, systematic conduct to the detriment of the Classes and for JPM's own economic benefit, using and/or retaining funds which unequivocally do not belong to JPM.

51.     In 2018, JPM delivered funds for over 19,900 abandoned cashier's checks with a face value of $41,055,858.94 million to the State of Ohio.   In contrast to prior reports to Ohio, JPM's 2018 report identified the states in which the cashier's checks were purchased.   Based on the amounts of the cashier's checks reported, the majority of the Checks in only a handful of the States of Purchase (none of which were Ohio) (and the majority of the amounts of the funds for the Checks), comprised the substantial majority of the escheated funds, as follows: California, 4,149 Checks in the amount of $10,270,479.89; New York, 3,917 Checks in the amount of $9,777,078.78; Texas, 3,123 Checks in the amount of $4,245,661.94; Illinois, 1,933 Checks in the amount of $3,232,567.32; Florida, 992 Checks in the amount of $3,073,858.08; and New Jersey, 403 Checks in the amount of $631,713.21.   Thus, the Checks in the States of Purchase alone account for $31,231,359.17 of the amount or approximately 76% of the funds in 2018 that JPM wrongfully delivered to Ohio.[12]   In contrast, Ohio accounted for only $1,341,037.01 or 3% of the funds delivered to Ohio.   The overwhelming majority of the cashier's checks were not purchased in the State of Ohio, and thus should have been delivered *two years earlier* to the States of Purchase which have a three year dormancy period, and/or to the other States of Purchase with a five year dormancy period when JPM wrongfully delivered the funds to Ohio. These figures demonstrate the impropriety of JPM's conduct.

52.     Further, upon information and belief, the foregoing figures generally apply to the abandoned cashier's check funds delivered to Ohio in years 2014-2017 (and likely prior to that time period).   First, these figures generally align with the significant number of branches JPM

---

[12] According to JPM's 2018 report to Ohio, Connecticut accounted for 117 Checks in the amount $313,972.77.

maintains in the States of Purchase.    Second, there is no known basis for the sales of cashier's

checks by JPM in years preceding escheatment in 2014-2017 to materially differ.    Third, based

on the investigation of counsel, there appear on the reports by JPM filed in Ohio in the period

2014-2017 funds for cashier's checks payable to numerous businesses, governmental entities and

individuals in states other than Ohio, making it extremely implausible that such cashier's checks

were purchased in Ohio.

     53.    For example, in 2015, JPM's reports show that JPM delivered over 13,000

abandoned cashier's checks, with a face value of over $ 18.3 million, to the State of Ohio.

Upon information and belief, the overwhelming majority of those checks were not purchased in

the State of Ohio and thus should have delivered *two years earlier* to the States of Purchase

which have a three year dormancy period, and/or to the other States of Purchase with a five year

dormancy period when JPM turned the funds over to Ohio.    Among many other examples, in

2015, JPM delivered abandoned cashier's checks on which the payees were identified as follows:

(1) Connecticut – Connecticut Department of Education, Treasurer of the State of Connecticut;

(2) New York - the NYPD Property Clerk, the NYS Office of Court Administration, the New

York State Department of Law, the City of Poughkeepsie, the NYS Education Department, the

Criminal Court of the City of New York, the Manhattan Borough President's Office, the State of

New York Mortgage Agency, Kew Gardens NY LLC, the New York State Department of State,

the Dormitory Authority, State of New York; (3) California - Superior Court of California, City

of Chico California, California Department of Veterans Affairs, State Bar of California,

University of California Los Angeles, California State Board of Pharmacy, California

Department of Motor Vehicles, California Offender Program Service, California Career Institute,

Premium Title Company of California; (4) Florida - Florida Department of Workman's Comp, Central Florida Fire Academy, Florida Department of Transportation, State of Florida, Florida Department of Revenue, Florida State University, Florida Wildlife Commission, Florida Department of State, Florida Memorial University, Miami-Dade Police Department, Miami-Dade Tax Collector; (5) Illinois – Special Olympics of Illinois, Illinois State Police, Illinois State Fair, the City of Chicago, Heart of Illinois United Way, Cook County Treasurer, Illinois Real Estate Partners, Inc, Illinois Department of Human Rights, Illinois State University, Illinois Parks and Recreation Association, Illinois Department of Revenue, Illinois Unemployment Security, Illinois Tollway, Illinois Department of Human Resources, Illinois Department of Labor, Illinois Secretary of State, Illinois Masonic Hospital; (6) New Jersey - NJ Board of Medical Examiners, Superior Court of New Jersey, NJ Family Support Center, New Jersey's Best DJ, Department of New Jersey Taxation, New Jersey Board of Nursing, Treasurer State of New Jersey, State of New Jersey Motor Vehicle; and (7) Texas – University of Texas, Texas Dep't of Public Safety, State of Texas, Texas A&M University, Texas Dep't of Insurance, Girl Scouts of Northeast Texas, Texas Dep't of Licensing and Regulation, City of Grapevine Texas Municipal Court, Orange Coast Title Co. of Texas, Texas Carpenters [and] Millwrights [Training Trust Fund], Texas Comptroller of Public Accounts.

54.     It is extremely unlikely that these and many similar abandoned cashier's checks were purchased in Ohio, and thus, the funds should not have escheated to Ohio.   Indeed, only approximately 5% of JPM's bank branches are located in Ohio.   California, New York, Texas, Florida and Illinois, in particular, far exceed the number of JPM branches in Ohio.   That fact, as well as the substantial economic and commercial activity in those particular States of Purchase in

3238030.2

relation to Ohio, further renders it implausible that all of the funds for abandoned cashier's checks properly escheated to Ohio.   Rather, pursuant to 12 U.S.C. § 2503, given the high likelihood that these and many other abandoned cashier's checks were purchased in the States of Purchase, the funds should have escheated to the respective States of Purchase.

55.    In addition to the examples cited above from 2015, there are likewise numerous other examples of individual payees on JPM's reports to Ohio who were located in the States of Purchase in 2014, 2016, and 2017, rendering it very unlikely that the abandoned cashier's checks were purchased in Ohio, rather than the States of Purchase, and thus, the funds for the overwhelming majority of the cashier's checks should have escheated to the States of Purchase, rather than Ohio.

56.    In 2014, JPM escheated funds for over 2,100 abandoned cashier's checks with a face value of over $2.9 million to the State of Ohio.   Upon information and belief, the overwhelming majority of those cashier's checks were not purchased in the State of Ohio and thus should have escheated *two years earlier* to the States of Purchase which have a three year dormancy period, and/or to the other States of Purchase with a five year dormancy period (Florida, and Illinois prior to 2018) when JPM turned the funds over to Ohio.   Among many other examples, in 2014, JPM delivered abandoned cashier's checks on which the payees were identified as follows: (1) New York – New York Law School, Clerk of the Surrogates Court - Queens; (2) California - Glendale Unified School District, Los Angeles County Registrar Records; (3) Florida – University of Central Florida; and (4) Illinois – Illinois Tollway, Cook County Recorder.

57.    In 2016, JPM escheated funds for over 14,000 abandoned cashier's checks with a face value of over $20.9 million to the State of Ohio.    Upon information and belief, the overwhelming majority of those checks were not purchased in the State of Ohio and thus should have escheated *two years earlier* to the States of Purchase which have a three year dormancy period, and/or to the other States of Purchase with a five year dormancy period when JPM turned the funds over to Ohio.    Among many other examples, in 2016, JPM delivered abandoned cashier's checks on which the payees were identified as follows: (1) New York – Nassau County Clerk, NYS State Employment Taxes, Westchester County, NYS Department of Law, New York State Fair; (2) California – Dental Board of California, AIDS Walk of California, San Francisco Marina, San Diego County Treasurer Tax Coll., Office of Finance, City of Los Angeles, California Department of Public Health, California Dept. of Fish & Game, Girl Scouts of San Diego, Imperial Co.; (3) Florida – Board of County of Miami-Dade, Sheriff of Broward County, Miami-Dade County Board of Commissioners; (4) Illinois – Cook County Treasurer, Circuit Court of Cook County, City of Chicago Water Department; (5) New Jersey – Treasurer of the State of New Jersey, State of New Jersey; and (6) Texas – Texas Department of Licensing, Forth Worth Municipal Court, Houston Police Department.

58.    In 2017, JPM escheated funds for over 16,000 abandoned cashier's checks with a face value of over $32.6 million to the State of Ohio.    Upon information and belief, the overwhelming majority of those checks were not purchased in the State of Ohio and thus should have escheated *two years earlier* to the States of Purchase which have a three year dormancy period, and/or to the other States of Purchase with a five year dormancy period when JPM turned the funds over to Ohio.    Among many other examples, in 2017, JPM delivered abandoned

3238030.2

cashier's checks on which the payees were identified as follows: (1) Connecticut – Treasurer of the State of Connecticut, Connecticut Department of Public Safety, State of Connecticut Department of Motor Vehicles; (2) New York – Long Island Power Authority, Commissioner of Motor Vehicles of New York; (3) California – Girls Scouts of Central California, San Francisco Opera Orchestra, Santa Cruz County, California Physicians' Assistant Comm, San Francisco Redevelopment Agency, California Labor Compliance Bureau, Southern California Cricket Association; (4) Florida – Broward County Tax Collector, Florida Department of Revenue; (5) Illinois – Cook County Treasury, Illinois Department of Human Services; (6) New Jersey – State of New Jersey Dept. of Labor and Workforce, Treasurer of the State of New Jersey, New Jersey State Board of Medicine; and (7) Texas – City of Houston; City of Ft. Worth Texas, Secretary of State of Texas.

59.     Even in the unlikely event that JPM did not know the state that certain cashier's checks were purchased, under Section 2503, JPM was required to escheat the funds to New York, JPM's principal place of business, not to Ohio, JPM's "home state."   Thus, at a minimum, the New York Purchase Subclass would have received notice and an opportunity the claim the funds.

60.     Upon information and belief, in years prior to 2014, JPM likewise escheated funds for abandoned cashier's checks improperly to Ohio, rather than the States of Purchase.

61.     Upon information and belief, JPM has also continued its systematic practices alleged herein in connection with funds for Checks that were deemed abandoned by JPM and subject to escheatment in 2019.

62.    In addition, given that Ohio has a business-to-business exemption relating to the escheatment of abandoned property, upon information and belief, JPM has not only failed to properly identify these business-to-business cashier's checks on annual reports to the States of Purchase (which, upon information and belief, is a material amount), but has also retained *all of the funds* for these uncashed cashier's checks between business entities – a substantial and improper windfall.

### E.    JPM's Conduct Harmed Plaintiffs and the Classes.

63.    JPM is liable to the Plaintiffs and members of the Classes for those funds for the Checks improperly delivered to Ohio since at least 2014 to date and likely prior to 2014 and for the funds not escheated at all in the case of business-to-business Checks.

64.    Further, if JPM is not required to deliver funds for abandoned cashier's checks to the States of Purchase, including for business–to-business checks, and to comply with the notice and report requirements of the States of Purchase, rather than the State of Ohio, owners of abandoned property will continue to be deprived of millions of dollars – if not hundreds of millions of dollars – of funds which rightfully belong to them.

65.    The States of Purchase are charged by their own laws and regulations with publishing notice or otherwise advising the public through various means of property escheated by those States, and have respectively developed and implemented a practice of engaging in various methods of targeted outreach to owners of unclaimed property escheated to the States. The public reports issued by the New York State Comptroller, for example, do not list any of the cashier's checks escheated to Ohio.   The public reports of other states do not list any of the

cashier's checks escheated to Ohio.   Thus, there is no possibility that any of Plaintiffs or the members of the Classes will be provided with notice or information by the respective States of Purchase about the existence of, or the ability and methods to claim, the funds relating to the Checks.

66.    JPM's delivery to the State of Ohio of abandoned funds for Checks not purchased in Ohio between at least 2014 and the present (and likely prior to 2014), which funds should have been delivered to the States of Purchase beginning no later than 2012, was in knowing and deliberate violation of 12 U.S.C. § 2503.

67.    JPM's delivery to the State of Ohio of the funds for abandoned Checks not purchased in Ohio deprived Plaintiffs and the members of the Classes of those funds for the Checks.

68.    In furtherance of JPM's wrongful and knowing failure to deliver the funds for abandoned Checks to the States of Purchase, as required by 12 U.S.C. § 2503 and the laws of the respective States of Purchase, executives in defendant JPM's abandoned property business function have caused JPM, each year from 2012 through 2018, to file knowingly false annual escheatment reports with the States of Purchase, intentionally failing to list the funds for the Checks in JPM's possession that were required to be delivered to the States of Purchase (and, at the very least, to New York if the state of purchase of certain of the Checks was unknown), and falsely certifying that required procedures and delivery of funds had been completed.   These reports were signed either by executives in JPM's abandoned property business function or by

other JPM executives at the direction of executives in JPM's abandoned property business

function.[13]

69.     In furtherance of JPM's wrongful and knowing failure to deliver the Checks to the

States of Purchase, and to New York if the state of purchase was unknown for certain of the

Checks, as required by 12 U.S.C. § 2503, and to give proper notice, executives in JPM's

abandoned property business function have caused JPM to knowingly conceal or knowingly and

improperly avoid its obligation to pay or deliver such abandoned funds for the Checks to the

Owners and/or to the States of Purchase.

70.     Under the respective abandoned property laws of each of the States of Purchase,

prior to the escheatment of the funds for the Checks, JPM was required to send direct notice by

mail – or, in certain circumstances – by electronic communication, to the owner of the funds

(and, in New York, to also provide publication notice). *See, e.g.*, CT § 3-65a; NY §1422 and

§302; CA §1513.5; FL §7.17.117(4); IL §1026/15-501; NJ §46:30B-50; and TX § 74.1011.

Upon information and belief, JPM failed to follow its statutory notice obligations, depriving the

owners of the knowledge of the existence of the funds, and the ability to claim the funds.

Likewise, JPM's failure to file properly reports in the States of Purchase has deprived owners of

the notice and outreach in the respective States of Purchase.

71.     Thus, JPM has (i) failed to provide required notice to owners, (ii) failed to

annually – beginning no later than 2012 and continuing through at least 2018 – properly file

---

[13] By filing such false reports between at least 2012 and 2018, JPM has, to date, avoided the statutory penalties
imposed by the respective States of Purchase predicated on the failure to properly report and deliver funds subject to
escheatment, yet another economic benefit to JPM.

reports and deliver escheated funds to the State of Purchase, and (iii) deprived owners of notice and communications by the State of Purchase.   All of which has deprived Owners of the funds to which they are entitled.

72.     Upon information and belief, the wrongful conduct of JPM continues to date.

## V.     FRAUDULENT CONCEALMENT TOLLING

73.     By failing to give proper notice to Plaintiffs and to members of the Classes, and failing to give publication notice in New York, and by failing to file proper reports, JPM concealed from the Plaintiffs and the members of the Classes the existence of the funds belonging to them and the existence of their claims to the funds and against JPM.

74.     By delivering the funds to the State of Ohio instead of the proper States of Purchase as required by 12 U.S.C. § 2503, and/or by simply keeping the funds, JPM concealed from the Plaintiffs and the members of the Classes the existence of the funds belonging to them and the existence of their claims to the funds and against JPM.

75.     Upon information and belief, JPM intended by its acts to conceal the facts and claims from Plaintiffs and members of the Classes.   Plaintiffs and the members of the Classes were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered JPM's conduct. For this reason, any statute of limitations or statute of repose that otherwise may apply to the claims of Plaintiffs or members of the Classes should be tolled.

## VI.     DISCOVERY RULE TOLLING

3238030.2

76.    Plaintiffs and the proposed Classes had no way of knowing about JPM's conduct with respect to the unclaimed funds for the Checks.

77.    JPM's concealed the funds, failed to provide notice of the funds, failed to file proper reports in the States of Purchase, and failed to deliver the funds to the States of Purchase – further depriving Plaintiffs and the Classes of notice or outreach by the States of Purchase. Therefore, neither Plaintiffs nor any other reasonable members of the Classes could have discovered the conduct, and neither Plaintiffs nor the members of the Classes, through the exercise of reasonable diligence, discovered that JPM was concealing and engaging in the deliberately false and misleading conduct alleged herein.

78.    Further, Plaintiff and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that the JPM was engaged in the conduct alleged herein, nor would a reasonable and diligent investigation have disclosed the true facts.

79.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims asserted by Plaintiffs and the proposed Classes.

## VII.    ESTOPPEL

80.    Despite its duties and obligations, JPM failed to provide notice of the funds, failed to file proper reports in the States of Purchase, and failed to deliver the funds to the States of Purchase – further depriving Plaintiffs and the Classes of notice or outreach by the States of Purchase.

3238030.2

81.    Based on the foregoing, JPM is estopped from relying on any statutes of limitations in defense of this action.

## VIII.  CLASS ALLEGATIONS

82.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2) and 23(b)(3), as representatives of the class defined as follows (the "Multistate Class"):

> All Owners of cashier's checks purchased from JPM in a State of Purchase (other than Ohio), which cashier's checks have not been negotiated, JPM has not paid any funds to either the Payee named on the cashier's check or the Purchaser of the cashier's check, and for which cashier's checks JPM has: (i) not delivered the funds to the State of Purchase (other than Ohio) based on an exemption that does not exist under the law of the State of Purchase (other than Ohio) and has retained the funds past the applicable dormancy period in the State of Purchase (other than Ohio); (ii) delivered the funds to Ohio or any state other than the State of Purchase; or (iii) retained all or a portion of the funds past the applicable dormancy period in the State of Purchase (other than Ohio).

83.    Alternatively, Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2) and 23(b)(3), as representatives of the following "State of Purchase Subclasses":

> All Owners of cashier's checks purchased from JPM in the State of [_____], which cashier's checks have not been negotiated, JPM has not paid any funds to either the Payee named on the cashier's check or the Purchaser of the cashier's check, and for which cashier's checks JPM has: (i) not delivered the funds to the State of [_____] based on an exemption that does not exist under the law of the State of [_____] and has retained the funds past the applicable dormancy period in the State of [_____]; (ii) delivered the funds to Ohio or any state other than the State of [_____]; or (iii) retained all or a portion of the funds past the applicable dormancy period in the State of [_____].
>
> The State of Purchase Subclasses are, respectively, Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho,

Illinois, Indiana, Kentucky, Louisiana, Michigan, Missouri, Nebraska, Nevada, New Jersey, New York, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, Tennessee, Texas, Utah, Washington, West Virginia and Wisconsin.

84.     Collectively, the Multistate Class and the State of Purchase Subclasses are referred to as the "Classes."

85.     Plaintiff Appleby also seeks certification of a claim for violation of the California Bus. & Prof. Code § 17200 *et seq*. on behalf of the California State of Purchase Subclass.

86.     Plaintiff Dill also seeks certification of a claim for violation of the Connecticut Unfair Trade Practices Act § 42-110a *et seq*. on behalf of the Connecticut State of Purchase Subclass.

87.     Plaintiffs reserve the right to expand, narrow or otherwise modify or refine the definition of the Classes based on additional information obtained through further investigation and discovery, and/or in order to accommodate any of the Court's manageability concerns.

88.     Specifically excluded from the Classes are defendant JPM, JPM's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by JPM, including subsidiaries and affiliates, and JPM's heirs, successors, assigns, or other persons or entities related to or affiliated with JPM and/or JPM's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

3238030.2

89.     *Numerosity*. Members of the Classes are so numerous (consisting of thousands of Owners of the Checks) and geographically dispersed that individual joinder is impracticable. Beginning no later than 2012, JPM has failed to pay to the members of the Class no less than $115 million plus the interest due on that amount, consisting of funds for tens of thousands of cashier's checks purchased in states other than Ohio.

90.     The members of the Classes are readily identifiable from information and records in the possession or control of JPM.

91.     Upon information and belief, less than one-third of all of the members of the proposed Classes in the aggregate are citizens of New York, where this action is originally being filed, and the total number of members of the proposed Classes is greater than 100.

92.     *Commonality and Predominance*.   Common questions of law and fact exist as to all members of the Classes, which predominate over any questions affecting only individual members of the Classes, including, but not limited to:

a.     Whether 12 U.S.C. § 2503 applies to cashier's checks;

b.     Whether JPM failed to follow 12 U.S.C. § 2503;

c.     Whether JPM breached its duties to Owners of the Checks and the abandoned/unclaimed property and escheatment laws of the States of Purchase in connection with the Checks;

d.     Whether JPM failed, and breached its duties, to give proper and adequate notice of the funds and Checks; to file proper reports in the correct States

36

of Purchase; and to deliver funds to the members of the Classes or to the

correct States of Purchase;

e.      Whether JPM's conduct constituted negligence and/or negligence *per se*;

f.      Whether JPM acted to conceal the abandoned cashier's checks from the

Owners;

g.      Whether JPM fraudulently concealed its conduct;

h.      Whether JPM converted the funds belonging to Plaintiffs and the members

of the Classes;

i.      Whether JPM was unjustly enriched by its conduct;

j.      Whether Plaintiffs and the members of the Classes are entitled to

monetary damages;

k.      The measure of damages suffered by Plaintiffs and the members of the

Classes.

l.      Whether Plaintiffs and the members of the Classes are entitled to

restitution, disgorgement and/or other equitable or injunctive relief.

93.      ***Typicality.***    The Plaintiffs' claims are typical of the claims of the members of the

Classes.    Plaintiffs and the members of the Classes were injured through the same conduct

described herein and they assert the same (or similar) claims for relief.

94.      ***Adequacy of Representation***.    The Plaintiffs will fairly and adequately protect

the interests of the Classes.    The interests of the Plaintiffs are consistent with and not

antagonistic to the interests of the other members of the Classes.    Plaintiffs have lost significant

amounts individually and collectively and have agreed to act for the benefit of all of the victims

37

similarly situated and not to put their individual interest ahead of any member of the Classes. Plaintiffs have retained competent counsel that is highly experienced in prosecuting complex fraud, consumer, and class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.

95.     ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of the claims of Plaintiffs and the members of the Classes.   The damages suffered by individual members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against JPM. It would be extremely difficult for the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Further, even if members of the Classes could afford such individualized litigation, the court system could not.   Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court.

96.     This proposed class action is manageable.   Plaintiffs know of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

97.     Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting

3238030.2

individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

98.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1), because the prosecution of separate actions by numerous individual members of the Classes may create a risk that inconsistent or varying adjudications would establish incompatible standards of conduct for the parties opposing the Classes, and may substantially impair or impede the interests of other members of the Classes to protect their interests.

99.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because JPM has acted or refused to act on grounds generally applicable to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Classes as a whole.

## **FIRST CAUSE OF ACTION**
**(Conversion)**
**(Plaintiffs, Individually and On Behalf of the Multistate Class or, Alternatively, Plaintiffs, Individually and On Behalf of the State of Purchase Subclasses)**

100.     Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 98 of this Complaint as if fully set forth herein.

101.     At all material times, Plaintiffs and the members of the Multistate Class or, alternatively, the members of the State of Purchase Subclasses, had and continue to have ownership rights to the Checks for which they were the payee and/or which they purchased.

102.     By virtue of JPM holding funds of the Owners beyond the applicable State of Purchase Dormancy Periods and using the funds for its own benefit, and either: (i) delivering the funds of the Owners to the State of Ohio, or retaining all or a portion of the funds pursuant to

Ohio St. § 169.05(A), rather than paying the funds to the Owners or delivering the funds to the correct State of Purchase (or, in the unlikely event the State of Purchase of certain Checks was unknown, to the State of New York), or (ii) retaining the funds based on the Ohio business-to-business exemption, JPM converted property belonging to Plaintiffs and the members of the State of Purchase Subclasses.

103.    Given JPM's conduct as outlined herein, which concealed and prevented the Owners' knowledge and/or discovery of the funds for the Checks, any demand required under the laws of any State of Purchase would be futile and therefore excused.

104.    As a direct and proximate cause of JPM's conversion, Plaintiffs and the members of the Multistate Class or, alternatively, the members of the State of Purchase Subclasses have been damaged in an amount to be proven at trial, but not less than the amount of the funds for the Checks, together with interest thereon.

105.    Upon information and belief, JPM's wrongful conduct was knowing and willful, or in reckless disregard of the Owners' rights, in that it knew the State of Purchase and knew that it was obligated to properly give notice to Owners of the funds, to properly file reports of the funds with the respective States of Purchase, to deliver the funds to the States of Purchase or, in the unlikely event the States of Purchase of certain Checks were unknown, then to the State of New York, and to deliver the funds subject to escheatment at the proper time.   By reason of the foregoing, Plaintiffs and the members of the Multistate Class and the members of the State of Purchase Subclasses are entitled to punitive damages in an amount to be proven at trial, plus attorneys' fees and costs of this litigation.

**SECOND CAUSE OF ACTION**
**(Negligence *Per Se*)**
**(Plaintiffs, Individually and On Behalf of the Multistate Class or, Alternatively, Plaintiffs, Individually and On Behalf of the State of Purchase Subclasses)**

106.    Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 104 of this Complaint as if fully set forth herein.

107.    Pursuant to the abandoned/unclaimed property laws and escheatment laws of the respective States of Purchase (*see, e.g.*, §§ 3-57a, 3-65a(a) and (b) of Connecticut's Unclaimed Property Law; §§ 300, 302 and 303, §1412-a, and §1422 of New York's Abandoned Property Law; §§ 1511, 1513, 1513.5, 1530, 1532, and 1581 of California's Unclaimed Property Law; §§ 717.105, 717.117 - 717.119 and §§717.1311 of Florida's Disposition of Unclaimed Property Act; §§ 1026/15-201, 1026/15-301 - 1026/15-307, 1026/15-401- 405, 1026/15- 501 - 502, and 1026/15-603 of Illinois's Revised Uniform Unclaimed Property Act; §§ 46:30B-16, 46:30B-46, 46:30B-47 and 46:30B-49, §46-30B-57, and §§ 46:30B-95, 46:30B-96 and 46:30-B-96.1 of New Jersey's Unclaimed Property Act; § 72.101, § 73.001, §§ 74.101- 74.104, §74.1011, and §74.301 of the Texas Property Code), and pursuant to 12 U.S.C. § 2503, JPM had a duty to Plaintiffs and the members of the Classes, as Owners of the Checks, to properly maintain the funds for those Checks and maintain adequate records with respect thereto, and to follow the abandoned/unclaimed property laws and escheatment laws of the applicable State of Purchase – and the federal rules of priority of escheatment of cashier's checks, including but not limited to the following duties:

(a)    To maintain proper and complete records of the Check purchased, the purchaser, the payee, the owner (if different than the payee), and the State

of Purchase (*see, e.g.*, §§ 3-65a(a) and (b) of Connecticut's Unclaimed

Property Law; §§ 303 and 1412-a of New York's Abandoned Property

Law; §§ 1530 and 1581 of California's Unclaimed Property Law; §§

717.1311 and 717.117 of Florida's Disposition of Unclaimed Property

Act; § 1026/15-404 of Illinois' Revised Uniform Unclaimed Property Act;

§§ 46:30B-47, 46:30B-95 46:30B-96 of New Jersey's Unclaimed Property

Act; and § 74.103 of the Texas Property Code).    As further described

herein, JPM, as a matter of standard business practice, JPM maintains

records of the Checks purchased, the state of purchase, the name and

address of the purchaser – who or which is typically a deposit account

holder – and often additional identifying information of the purchaser,

and the name and often the address of the payee (or the owner, if

different than the payee);

(b)    To give proper and adequate direct and other notice (including additional

publication notice in New York) to the Owners of the funds, advising that

JPM maintained these funds, that the funds were going to be deemed

abandoned under state law in accordance with the applicable Dormancy

Period in the State of Purchase, and that JPM intended to deliver the funds

to the State of Purchase if the funds remained unclaimed (*see, e.g.*, § 3-

65a(a) of Connecticut's Unclaimed Property Law; §§ 302 and 1422 of

New York's Abandoned Property Law; §1513.5 of California's

Unclaimed Property Law; § 717.117(4) of Florida's Disposition of

42

Unclaimed Property Act; §§ 1026/15-501 - 502 of Illinois' Revised

Uniform Unclaimed Property Act; § 46-30B-50 of New Jersey's

Unclaimed Property Act; and § 74.1011 of the Texas Property Code);

(c)     To file complete and accurate escheatment reports with the correct State of

Purchase in connection with the funds (*see e.g.*, § 3-65a(b) of

Connecticut's Unclaimed Property Law; §§ 300 and 303(1)-(4) of New

York's Abandoned Property Law; § 1530 of California's Unclaimed

Property Law; § 717.117 of Florida's Disposition of Unclaimed Property

Act; §§ 46-30B-46, 46-30B-47 and 46-30B-49 of New Jersey's Unclaimed

Property Act; §§ 1026/15-401 - 403 of Illinois' Revised Uniform

Unclaimed Property Act; and § 74.101 of the Texas Property Code);

(d)     If the funds were not claimed by the Owner after notice (or upon

abandonment), to timely deliver the funds to the proper State of Purchase

in accordance with the applicable Dormancy Period, or, in the unlikely

event that the State of Purchase was unknown, then to the State of New

York as JPMs principal place of business, so that, among other things, the

State of Purchase could provide notice and advise Plaintiffs and the

members of the Classes of the unclaimed funds (*see, e.g.*, § 3-65a(b) of

Connecticut's Unclaimed Property Law; § 303(1) of New York's

Abandoned Property Law; § 117.119(1) of Florida's Disposition of

Unclaimed Property Act; § 1532 of California's Unclaimed Property Law;

43

§ 1026/15-603 of Illinois' Revised Uniform Unclaimed Property Act; §§
46-30B-57 and § 46-30B-60.1 of New Jersey's Unclaimed Property Act;
and § 74.301(a) of the Texas Property Code).

108.    JPM failed to fulfill, and thereby breached and violated, all of the duties set forth
above, and further breached and violated its duties by delivering the funds of the Owners of the
Checks to the State of Ohio and/or retaining all or a portion of the funds pursuant to Ohio St. §
169.05(A), or by retaining the funds based on the Ohio business-to-business exemption, rather
than paying the funds to Plaintiffs and members of the Classes, or delivering the funds to the
correct States of Purchase or, in the unlikely event the States of Purchase of certain Checks were
unknown, to the State of New York,

109.    JPM's conduct as described above constitutes negligence *per se*.

110.    Plaintiffs and the members of the Classes, as the Owners of the Checks entitled to
the funds, are within the class and persons and entities that the foregoing statutes and regulations
were intended to protect.

111.    As a direct and proximate result of JPM's wrongful conduct, Plaintiffs and the
members of the Classes have been damaged in an amount to be proven at trial, but not less than
the amount of the funds for the Checks, together with interest thereon.

112.    JPM's wrongful conduct was knowing and willful or in reckless disregard of the
Owners' rights, in that it knew the State of Purchase and knew that it was obligated to properly
give notice to Owners of the funds, to properly file reports of the funds with the States of

Purchase, to deliver the funds to the States of Purchase or, in the unlikely event the States of Purchase of certain Checks were unknown, then to the State of New York, and to deliver the funds subject to escheatment at the proper time.   By reason of the foregoing, Plaintiffs and the members of the Classes are entitled to punitive damages in an amount to be proven at trial, plus attorneys' fees and costs of this litigation.

### THIRD CAUSE OF ACTION
**(Negligence)**
**(Plaintiffs, Individually and On Behalf of the Multistate Class or, Alternatively, Plaintiffs, Individually and On Behalf of the State of Purchase Subclasses)**

113.     Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 111 of this Complaint as if fully set forth herein.

114.     JPM had a duty to Plaintiffs and the members of the Classes, as Owners of the Checks, to properly maintain the funds for those Checks and maintain adequate records with respect thereto, and to follow the abandoned/unclaimed property laws and escheatment laws of the applicable States of Purchase – and the federal rules for escheatment of the Checks, including but not limited to the following duties:

> (a)     To maintain proper and complete records of the Check purchased, the purchaser, the payee, the owner (if different than the payee), and the State of Purchase (*see, e.g.*, §§ 3-65a(a) and (b) of Connecticut's Unclaimed Property Law; §§ 1530 and 1581 of California's Unclaimed Property Law; §§ 717.1311 and 717.117 of Florida's Disposition of Unclaimed Property

Act; § 1026/15-404 of Illinois' Revised Uniform Unclaimed Property Act; §§ 46:30B-47, 46:30B-95 46:30B-96 of New Jersey's Unclaimed Property Act; §§ 303 and 1412-a of New York's Abandoned Property Law; and § 74.103 of the Texas Property Code).   As further described herein, JPM, as a matter of standard business practice, JPM maintains records of the Checks purchased, the state of purchase, the name and address of the purchaser – who or which is typically a deposit account holder – and often additional identifying information of the purchaser, and the name and often the address of the payee (or the owner, if different than the payee);

(b)    To give proper and adequate direct and other notice (including additional publication notice in New York) to the Owners of the funds, advising that JPM maintained these funds, that the funds were going to be deemed abandoned under state law in accordance with the applicable Dormancy Period in the State of Purchase, and that JPM intended to deliver the funds to the State of Purchase if the funds remained unclaimed (*see, e.g.*, § 3-65a(a) of Connecticut's Unclaimed Property Law; §§ 302 and 1422 of New York's Abandoned Property Law; §1513.5 of California's Unclaimed Property Law; § 717.117(4) of Florida's Disposition of Unclaimed Property Act; §§ 1026/15-501 - 502 of Illinois' Revised Uniform Unclaimed Property Act; § 46-30B-50 of New Jersey's Unclaimed Property Act; and § 74.1011 of the Texas Property Code);

46

(c)     To file complete and accurate escheatment reports with the correct State of Purchase in connection with the funds (*see e.g.*, § 3-65a(b) of Connecticut's Unclaimed Property Law;§§ 300 and 303(1)-(4) of New York's Abandoned Property Law; § 1530 of California's Unclaimed Property Law; § 717.117 of Florida's Disposition of Unclaimed Property Act; §§ 46-30B-46, 46-30B-47 and 46-30B-49 of New Jersey's Unclaimed Property Act; §§ 1026/15-401 - 403 of Illinois' Revised Uniform Unclaimed Property Act; and § 74.101 of the Texas Property Code);

(d)     If the funds were not claimed by the Owner after notice (or upon abandonment), to timely deliver the funds to the proper State of Purchase in accordance with the applicable Dormancy Period, or, in the unlikely event that the State of Purchase was unknown, then to the State of New York as JPMs principal place of business, so that, among other things, the State of Purchase could provide notice and advise Plaintiffs and the members of the Classes of the unclaimed funds (*see, e.g.*, § 3-65a(b) of Connecticut's Unclaimed Property Law; § 303(1) of New York's Abandoned Property Law; § 117.119(1) of Florida's Disposition of Unclaimed Property Act; § 1532 of California's Unclaimed Property Law; § 1026/15-603 of Illinois' Revised Uniform Unclaimed Property Act; §§ 46-30B-57 and § 46-30B-60.1 of New Jersey's Unclaimed Property Act; and § 74.301(a) of the Texas Property Code).

47

3238030.2

115.    The standard of care owed by JPM is defined by (i) common law; (ii) industry custom and practice; (iii) the abandoned/unclaimed property laws and escheatment laws of the respective States of Purchase (*see, e.g.*, §§ 3-57a, 3-65a(a) and (b) of Connecticut's Unclaimed Property Law; §§ 300, 302 and 303, §1412-a, and §1422 of New York's Abandoned Property Law; §§ 1511, 1513, 1513.5, 1530, 1532, and 1581 of California's Unclaimed Property Law; §§ 717.105, 717.117 - 717.119 and §§717.1311 of Florida's Disposition of Unclaimed Property Act; §§ 1026/15-201, 1026/15-301 - 1026/15-307, 1026/15-401- 405, 1026/15- 501 - 502, and 1026/15-603 of Illinois's Revised Uniform Unclaimed Property Act; §§ 46:30B-16, 46:30B-46, 46:30B-47 and 46:30B-49, §46-30B-57, and §§ 46:30B-95, 46:30B-96 and 46:30-B-96.1 of New Jersey's Unclaimed Property Act; § 72.101, § 73.001, §§ 74.101- 74.104, §74.1011, and §74.301 of the Texas Property Code; and (iv) 12 U.S.C. § 2503.

116.    JPM owed these duties of care to Plaintiffs and the members of the Classes because – as the Owners of the Checks entitled to the funds – they were foreseeable and probable victims of JPM's failure to follow and act in accordance with industry guidelines, internal processes, and the laws and regulations governing the Checks.

117.    JPM failed to fulfill, and thereby breached and violated, all of the duties set forth above, and further breached and violated its duties by delivering the funds of the Owners of the Checks to the State of Ohio and/or retaining all or a portion of the funds pursuant to Ohio St. § 169.05(A), or by retaining the funds based on the Ohio business-to-business exemption, rather than paying the funds to Plaintiffs and members of the Classes, or delivering the funds to the

correct States of Purchase or, in the unlikely event the States of Purchase of certain Checks were unknown, to the State of New York,

118.     As a direct and proximate result of JPM's wrongful conduct, Plaintiffs and the members of the Classes have been damaged in an amount to be proven at trial, but not less than the amount of the funds for the Checks, together with interest thereon.

119.     JPM's wrongful conduct was knowing and willful or in reckless disregard of the Owners' rights, in that it knew the State of Purchase and knew that it was obligated to properly give notice to Owners of the funds, to properly file reports of the funds with the States of Purchase, to deliver the funds to the States of Purchase or, in the unlikely event the States of Purchase of certain Checks were unknown, then to the State of New York, and to deliver the funds subject to escheatment at the proper time.   By reason of the foregoing, Plaintiffs and the members of the Classes are entitled to punitive damages in an amount to be proven at trial, plus attorneys' fees and costs of this litigation.

<u>**FOURTH CAUSE OF ACTION**</u>
**(Unjust Enrichment)**
**(Plaintiffs, Individually and On Behalf of the Multistate Class or, Alternatively, Plaintiffs, Individually and On Behalf of the State of Purchase Subclasses)**

120.     Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 118 of this Complaint as if fully set forth herein.

121.     By retaining and using the funds belonging to the Owners of the Checks – either longer than the applicable States of Purchase Dormancy Period, by virtue of an exemption that did not apply in the States of Purchase, and/or because JPM is permitted by the State of Ohio to

retain 90% of all funds subject to escheatment (even though those funds should have been delivered to the correct States of Purchase rather than Ohio) – Plaintiffs and the members of the Classes conferred a monetary benefit on JPM.[14]

122.    JPM retained and used these funds and profited – and continues to profit – without the consent of Plaintiffs, and without compensating Plaintiffs and the members of the Classes.

123.    As a result of JPM's wrongful conduct, JPM received benefits at the expense of, and to the detriment of, the Plaintiffs and the members of the Classes.

124.    JPM's conduct was knowing and intentional, and JPM appreciated the monetary benefits conferred by the Plaintiffs and the members of the Classes.

125.    It would be unconscionable and inequitable for JPM to retain those monetary benefits.

126.    As a direct and proximate result of JPM's wrongful conduct and unjust enrichment, JPM is liable to the Plaintiffs and the members of the Classes for restitution in the amount of the monetary benefits conferred upon JPM, including, without limitation, the funds JPM has wrongfully retained as well as JPM's profits, benefits and other compensation wrongfully obtained.

---

[14] JPM may actually be retaining the additional 10% of the funds escheated by Ohio under Ohio's protocol for maintenance of escheated funds.

3238030.2

127.    JPM should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and the members of the Classes the proceeds that it unlawfully, inequitably and unjustly received and/or realized as a result of its conduct.

## FIFTH CAUSE OF ACTION
**(Violation of Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a *et seq.*)**
**(Plaintiff Dill, Individually and on Behalf of the Connecticut State of Purchase Subclass)**

128.    Plaintiff Dill repeats and incorporates by reference the allegations of paragraphs 1 through 126 of this Complaint as if fully set forth herein.

129.    Since at least as early as 2012 and, upon information and belief, earlier, JPM has engaged in deceptive, unfair and unlawful trade acts or practices in the conduct of trade or commerce, in violation of C.G.S. § 42-110b as follows.

130.    Upon information and belief, JPM sold thousands of the Checks in Connecticut during the relevant time period.   In addition, as a matter of standard business practice, and pursuant to Connecticut's Unclaimed Property Law (C.G.S. §§ 3-65a(a) and (b)) and 12 U.S.C. § 2503, JPM maintains records of the Checks purchased, the state of purchase, the name and address of the purchaser – who or which is typically a deposit account holder – and often additional identifying information of the purchaser, and the name and often the address of the payee (or the owner, if different than the payee).

131.    Pursuant to § 3-65a(a) of Connecticut's Unclaimed Property Law (C.G.S. § 3-65a(a)), JPM was and is required to provide direct notice by mail to the Owners of the funds for the Checks, informing Owners that JPM maintained these funds, that the funds were going to be

deemed abandoned in accordance with the applicable Dormancy Period in Connecticut, and that JPM intended to deliver the funds to Connecticut if they remained unclaimed;

132.    Pursuant to § 3-65a(b) of Connecticut's Unclaimed Property Law (C.G.S. § 3-65a(b)), JPM was and is required to annually file complete and accurate reports with Connecticut in connection with escheatment of the funds;

133.    Pursuant to § 3-65a(b) of Connecticut's Unclaimed Property Law (C.G.S. § 3-65a(b)), upon abandonment of the funds without being claimed by the Owner after notice, JPM was and is required to timely deliver the funds to Connecticut in accordance with the three-year Dormancy Period, so that, among other things, Connecticut could provide notice and advise Plaintiff Dill and the members of the Connecticut State of Purchase Subclass of the unclaimed funds so that they could claim the funds they own.

134.    JPM failed to fulfill, and thereby breached, all of the duties and statutory obligations set forth above.   JPM further breached all of its duties and statutory obligations by wrongfully delivering the funds (in whole or in part) to Ohio – or by unjustifiably retaining the funds under the Ohio business-to-business exemption which does not apply to these funds – rather than paying the funds to Plaintiff Dill and the members of the Connecticut State of Purchase Subclass.   JPM further breached all of its duties and statutory obligations set forth above by omitting, suppressing or concealing from Plaintiff Dill and the members of the Connecticut State of Purchase Subclass that the funds they own escheated to Ohio, or remain in JPM's possession.

3238030.2

135.    JPM's deceptive, unfair and unlawful trade acts or practices were immoral, unethical, oppressive and unscrupulous.

136.    As a direct and proximate result of JPM's deceptive, unfair and unlawful trade acts or practices, Plaintiff Dill and the members of the Connecticut State of Purchase Subclass have suffered damages, including, but not limited to, the amount of the funds for the Checks, together with interest thereon.

137.    JPM's knew or should have known that its conduct was wrongful, and was wanton, willful or in reckless disregard of the rights of Plaintiff Dill and the members of the Connecticut State of Purchase Subclass.

138.    As a result of JPM's conduct, Plaintiff Dill and the members of the Connecticut State of Purchase Subclass are entitled to all available damages and remedies available under C.G.S. § 42-110a, *et seq*., including, but not limited to, actual damages, injunctive or other equitable relief to stop these unlawful and deceptive practices, costs and reasonable attorneys' fees.

**SIXTH CAUSE OF ACTION**
**(Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.)**
**(Plaintiff Appleby, Individually and on Behalf of the California State of Purchase Subclass)**

139.    Plaintiffs repeat and incorporate by reference the allegations of paragraphs 1 through 137 of this Complaint as if fully set forth herein.

140.    Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL") prohibits unfair competition in the form of unlawful, unfair, or fraudulent business acts or practices. UCL § 17204

provides that "a person who has suffered injury in fact and has lost money or property" may prosecute a civil action for violation of the UCL, on his or her own behalf and on behalf of others similarly situated who are affected by the unlawful, unfair or fraudulent business practice.   Since at least as early as 2012 and, upon information and belief, earlier, JPM has engaged in deceptive and unlawful trade acts or practices in the conduct of trade or commerce or furnishing of services in violation of UCL § 17200 as follows.

141.    Upon information and belief, JPM sold thousands of the Checks in California during the relevant time period.   In addition, as a matter of standard business practice, and pursuant to California's abandoned property and escheatment laws (California's Unclaimed Property Law §1530 and §1581) and 12 U.S.C. § 2503, JPM maintains records of the Checks purchased, the state of purchase, the name and address of the purchaser – who or which is typically a deposit account holder – and often additional identifying information of the purchaser, and the name and often the address of the payee (or the owner, if different than the payee).

142.    Pursuant to §1513.5 of California's Unclaimed Property Law, JPM was and is required to provide direct notice by mail to the Owners of the funds for the Checks, informing Owners that JPM maintained these funds, that the funds were going to be deemed abandoned in accordance with the applicable Dormancy Period in California, and that JPM intended to deliver the funds to California if they remained unclaimed;

3238030.2

143.    Pursuant to §1530 of California's Unclaimed Property Law JPM was and is required to annually file complete and accurate reports with California in connection with escheatment of the funds;

144.    Pursuant to §1532 of California's Unclaimed Property Law, upon abandonment of the funds without being claimed by the Owner after notice, JPM was and is required to timely deliver the funds to California in accordance with the three-year Dormancy Period so that, among other things, California could provide notice and advise Plaintiff Appleby and the members of the California State of Purchase Subclass of the unclaimed funds so that they could claim the funds they own.

145.    JPM failed to fulfill, and thereby breached, all of the duties and statutory obligations set forth above.   JPM further breached all of its duties and statutory obligations by wrongfully delivering the funds to Ohio – or by unjustifiably retaining the funds under the Ohio business-to-business exemption which does not apply to these funds – rather than paying the funds to Plaintiff Appleby and members of the California State of Purchase Subclass, or to California.   JPM further breached all of its duties and statutory obligations set forth above by omitting, suppressing or concealing from Plaintiff Appleby and the members of the California State of Purchase Subclass that the funds they own escheated to Ohio, or remain in JPM's possession.

146.    JPM's conduct constitutes recurring unlawful, unfair, and/or fraudulent business acts or practices in violation of UCL § 17200.

147.    JPM's acts and practices were and are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff Appleby and the members of the California State of Purchase Subclass.

148.    JPM's acts and practices were and are materially misleading to consumers.

149.    JPM's deceptive and unlawful practices were and are consumer-oriented and constitute deceptive acts and practices in the conduct of its business in violation of UCL § 17200.

150.    As a direct and proximate result of JPM's conduct, Plaintiff Appleby and the members of the California State of Purchase Subclass have suffered injury in the form of lost money or property, including, but not limited to, the amount of the funds for the Checks, together with interest thereon.

151.    JPM's knew or should have known that its conduct was wrongful, and was wanton, willful or in reckless disregard of the rights of Plaintiff Appleby and the members of the California State of Purchase Subclass.

152.    As a result of JPM's recurring deceptive acts and practices, Plaintiff Appleby and the members of the California State of Purchase Subclass are entitled to all available relief and remedies available under § 17200 *et seq.*, including, but not limited to, restitution of money or property that JPM may have acquired by means of deceptive, unlawful and unfair business practices, restitutionary disgorgement, reasonable attorneys' fees (pursuant to California Code of Civil Procedure § 1021.5), and injunctive or other equitable relief.

3238030.2

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Classes, respectfully request that the Court:

A.      Certify this action and the Classes as requested herein, appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' attorneys as Class Counsel.

B.      Enter judgment against JPM and in favor of Plaintiffs and the Classes on the causes of action asserted herein.

C.      Award to Plaintiffs and each member of the Classes actual, compensatory, general and/or statutory damages in an amount to be determined at trial.

D.      Award Plaintiffs and the Classes disgorgement and restitution of all ill-gotten gains, together with all proceeds, interest, income, profits, and accessions thereto as a result of JPM's unlawful conduct.

E.      Award Plaintiffs and the Classes exemplary and/or punitive damages, as allowed by law, in an amount to be determined at trial.

F.      Award Plaintiffs and the Classes injunctive and/or other appropriate equitable relief pursuant to C.G.S. § 42-110a *et seq*. and Cal. Bus. & Prof. Code § 17200 *et seq*.

G.      Award Plaintiffs and the Classes attorneys' fees and costs, as allowed by law.

H.      Award Plaintiffs and the Classes prejudgment and post-judgment interest, as allowed by law.

I.      Award such other relief as the Court deems just and equitable.

3238030.2

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs and the Classes demand trial by a jury on all issues so triable.

DATED: July 6, 2020

**SILVER GOLUB & TEITELL LLP**

By:_____/s/ David S. Golub_____
David S. Golub
dgolub@sgtlaw.com
Steven L. Bloch
sbloch@sgtlaw.com
Ian W. Sloss
isloss@sgtlaw.com
Zachary A. Rynar
zrynar@sgtlaw.com
184 Atlantic Street
Stamford CT 06901
T: 203.325.4491
F: 203.325.3769

**GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP**

By:  /s/ Michael S. Devorking_____
Michael S. Devorkin
mdevorkin@golenbock.com
Leron Thumim
lthumim@golenbock.com
711 Third Avenue
New York, New York 10017
T:   (212) 907-7300
F:   (212) 754-0330

*Attorneys for Plaintiffs and the Proposed Classes*

3238030.2