UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAROLD R. DILL, EDWARD M. APPLEBY, and
KARI GARBER,

                      Plaintiffs,

      -v.-

JPMORGAN CHASE BANK, N.A.,

                      Defendant.

19 Civ. 10947 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

      Plaintiffs Harold Dill and Edward Appleby (for the purposes of this Opinion, "Plaintiffs"), along with Kari Garber, bring this putative class action against Defendant JPMorgan Chase Bank, N.A., alleging that Defendant failed to comply with established federal and state laws governing the escheatment of abandoned property in the form of millions of dollars in funds payable on uncashed cashier's checks.  As redress, Plaintiffs seek, *inter alia*, the recovery of the funds payable on the checks owned by them and members of the putative classes.  Defendant argues that these claims are governed by Defendant's Account Rules & Regulations (the "Deposit Account Agreement," or "DAA"), which contains a broad arbitration provision.  In consequence, Defendant now moves to compel arbitration of Plaintiffs' claims pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), and to stay this case pending the outcome of that arbitration.  Plaintiffs oppose the motion, arguing that their claims are not covered by the DAA.  For the reasons set forth in the

remainder of this Opinion, Defendant's motion to compel arbitration is granted and the instant action is stayed solely as to Plaintiffs.

## BACKGROUND[1]

### A.     Factual Background

#### 1.     The Parties

Plaintiffs Dill and Appleby are individuals who purchased cashier's checks (the "Checks") from Defendant, using funds from their accounts with Defendant, through branch offices located in Connecticut and California, respectively. (Compl. ¶¶ 11-12; Villarreal Decl. ¶ 4; *see also* Dkt. #33). Dill purchased four Checks, all payable to himself, from Defendant in or about December 2012 at a branch in Darien, Connecticut, in the aggregate amount of $12,786.53. (Compl. ¶ 11). Appleby purchased several Checks, all payable to himself and each in the amount of $10,000, in approximately 2013 from a branch in California. (*Id.* at ¶ 12).

---

[1]   The facts in this Opinion are drawn primarily from Plaintiffs' Amended Complaint ("Amended Complaint" or "Compl." (Dkt. #55)), which is the operative pleading in this case. While the Amended Complaint was filed after the parties submitted their briefing on the instant motion, the Court notes that the Amended Complaint is analytically indistinct from the original Complaint for the purposes of this motion.

Facts are also drawn from the Declaration of Laura Deck in Support of Defendant's Motion to Compel Arbitration and to Stay Proceedings Pending Arbitration ("Deck Decl." (Dkt. #20)), including the exhibits thereto; the Declaration of William A. Garrett in Support of Defendant's Motion to Compel Arbitration and to Stay Proceedings Pending Arbitration ("Garrett Decl." (Dkt. #21)); and the Declaration of Faith Villarreal in Support of Defendant's Motion to Compel Arbitration and to Stay Proceedings Pending Arbitration ("Villarreal Decl." (Dkt. #22)).

For ease of reference, the Court refers to Defendant's opening brief as "Def. Br." (Dkt. #18); Plaintiffs' opposition brief as "Pl. Opp." (Dkt. #35); and Defendant's reply brief as "Def. Reply" (Dkt. #37).

2

Defendant is a national bank, with its home office in the state of Ohio, principal place of business in the state of New York, and approximately 5,190 branch offices in multiple states, including the states where the Checks were purchased. (Compl. ¶ 14). Defendant is a "banking organization" as defined in § 103(c) of New York's Abandoned Property Law ("APL") and as defined by the abandoned property laws of the various states of purchase. (*Id.*).

### 2. Plaintiffs' Accounts with Defendant and Acknowledgment of the Deposit Account Agreements

Given that the instant motion turns on the arbitration clause in Defendant's DAA, the Court provides further detail on Plaintiffs' accounts with Defendant and the relevant provisions of the DAA.

Dill was an account holder with Washington Mutual ("WaMu") in Connecticut when Defendant sent Dill a welcome letter informing him that his WaMu deposit account and services would become a similar account and services with Defendant (the "7236 Account"). (Deck Decl. ¶¶ 2-4; *id.* at Ex. A). Along with the letter, Defendant sent Dill a copy of its DAA (the "2009 DAA"), which informed Defendant's account-holders that they agreed to be bound by its terms and conditions. (*Id.* at ¶¶ 3-4; *id.* at Ex. B). In June 2011, Dill opened an additional account with Defendant in Connecticut, ending in 5692 (the "5692 Account"). (*Id.* at ¶ 5). Dill executed a signature card acknowledging receipt of the 2009 DAA when he opened the 5692 Account. (*Id.*). Thereafter, Defendant revised the terms of the DAA and included it as an insert to the December 2011 monthly statement sent to Dill, with an effective

date of February 1, 2012 (the "2012 DAA"). (*Id.* at ¶ 6; *id.* at Ex. C). In October 2012, Dill closed the 7236 and 5692 Accounts. (*Id.*). In November 2012, Dill opened another account with Defendant in Connecticut, ending in 6980, which remains open today (the "6980 Account"). (*Id.*). Dill executed a signature card acknowledging receipt of the 2012 DAA when he opened the 6980 Account. (*Id.* at ¶ 5).

In July 2012, Plaintiff Appleby was added as an account holder to an account with Defendant, ending in 8419 (the "8419 Account"), and executed a signature card acknowledging receipt of the 2012 DAA. (Deck Decl. ¶ 7; *id.* at Ex. D). The account was located in California. (*Id.* at ¶ 7). In February 2013, Appleby opened another account ending in 9517 (the "9517 Account"). (*Id.*). The 8419 Account was closed in November 2013 and the 9517 account was closed in January 2014. (*Id.*).

### 3. The Relevant Terms of the 2012 DAA

The 2012 DAA contained detailed terms governing the arbitration of disputes and informed customers that they had an opportunity to opt out of the agreement to arbitrate. (Deck Decl. ¶ 8; *id.*, Ex. C at 26; *id.*, Ex. D at 19-20). The 2012 DAA arbitration clause states, in relevant part:

> You and we agree that upon the election of either of us, any dispute relating in any way to your account or transactions will be resolved by binding arbitration as discussed below, and not through litigation in any court (except for matters in small claims court). This arbitration agreement is entered into pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). …

4

> UNLESS YOU OPT OUT OF ARBITRATION, YOU AND WE ARE WAIVING THE RIGHT TO HAVE OUR DISPUTE HEARD BEFORE A JUDGE OR JURY, OR OTHERWISE TO BE DECIDED BY A COURT OR GOVERNMENT TRIBUNAL. …
>
> ALL DISPUTES, EXCEPT AS STATED BELOW, MUST BE RESOLVED BY BINDING ARBITRATION WHEN EITHER YOU OR WE REQUEST IT.

(*Id.*, Ex. C at 26; *id.*, Ex. D at 19-20). In a subsection headed "What claims or disputes are subject to arbitration?," the provision states:

> Claims or disputes between you and us about your deposit account, transactions involving your deposit account, safe deposit box, and any related service with us are subject to arbitration. Any claims or disputes arising from or relating to this agreement, any prior account agreement between us, or the advertising, the application for, or the approval or establishment of your account are also included. Claims are subject to arbitration, regardless of what theory they are based on or whether they seek legal or equitable remedies. Arbitration applies to any and all such claims or disputes, whether they arose in the past, may currently exist, or may arise in the future. All such claims or disputes are referred to in this agreement as "Claims."
>
> The only exception to arbitration of Claims is that both you and we have the right to pursue a Claim in a small claims court instead of arbitration, if the Claim is in that court's jurisdiction and proceeds on an individual basis.

(*Id.*, Ex. C at 26; *id.*, Ex. D at 20). Finally, the agreement allowed customers to opt out of arbitration, stating:

> YOU HAVE A RIGHT TO OPT OUT OF THIS AGREEMENT TO ARBITRATE, AS DISCUSSED BELOW. … You have the right to opt out of this agreement to arbitrate if you tell us within 60 days of opening our account (or within 60 days of the effective date of this agreement, if your account was already open).

5

(*Id.*, Ex. C at 26; *id.*, Ex. D at 19-20).

Recipients of the 2012 DAA were permitted to opt out of arbitration within 60 days after February 1, 2012 (the effective date of the opt-out provision) or within 60 days of receipt of the DAA, either by calling a toll-free telephone number or by contacting a JPMorgan Chase banker. (Garrett Decl. ¶ 4). Specifically, Dill was notified of the right to opt out of arbitration in his December 2011 bank statement. (*Id.* at ¶ 5). Appleby, meanwhile, was notified of the right to opt out of arbitration in July 2012, when he was added to the 8419 Account. (*Id.* at ¶ 6). Defendant's databases do not reflect any opt-out request from Dill or Appleby. (*Id.* at ¶ 7).

### 4. The Alleged Conduct

Plaintiffs' claims stem from their aforementioned purchases of the Checks from Defendant with funds from their respective accounts with Defendant. (Compl. ¶¶ 1-2, 11-12; Villarreal Decl. ¶ 4). They allege that the Checks were never negotiated (i.e., cashed) and that Defendant paid no funds on the Checks. (Compl. ¶ 2). Thus, Plaintiffs claim that the Checks eventually became abandoned property subject to applicable state laws of escheatment and to 12 U.S.C. § 2503, the federal statute governing the priority of escheatment of written instruments (including cashier's checks). (*Id.* at ¶¶ 19-25). However, instead of following the applicable state laws of escheatment and § 2503, Defendant allegedly delivered the funds from the Checks to Ohio. (*Id.* at ¶¶ 11-12). Plaintiffs further allege that Defendant failed to provide them with proper notice that the Checks had been deemed abandoned. (*Id.*). Such

6

notice would have enabled Plaintiffs to claim the funds to which they were entitled. (*Id.*). As a result of Defendant's alleged misconduct, Plaintiffs claim that they were deprived of proper notice, of the use of funds from the uncashed Checks, and of the interest thereon. (*Id.* at ¶ 32).

**B.     Procedural Background**

Plaintiffs filed their initial complaint on November 26, 2019, bringing claims for conversion, negligence *per se*, negligence, and unjust enrichment on behalf of themselves and various classes. (Dkt. #1). Dill, on behalf of a subclass of Connecticut purchasers, alleged a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a to 42-110q, while Appleby, on behalf of a subclass of California purchasers, alleged a violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 to 17210. (*Id.*). The case was originally assigned to the Honorable Andrew L. Carter, Jr., but was then reassigned to the Honorable Louis L. Stanton. (Minute Entry for December 3, 2019). The case was reassigned to this Court on December 4, 2019. (Minute Entry for December 4, 2019).

On January 31, 2020, Defendant filed the instant motion to compel arbitration and to stay this action pending arbitration, along with a supporting memorandum and several declarations. (Dkt. #17-22). On February 21, 2020, the Court ordered the parties to meet and confer on a schedule for discovery relating solely to the existence of a valid arbitration agreement between the parties. (Dkt. #27). The parties submitted a joint report on the status of discovery on March 27, 2020 (Dkt. #33), and thereafter the Court found that

the parties needed no additional discovery to resolve this motion (Dkt. #34). Plaintiffs filed their opposition brief on April 27, 2020. (Dkt. #35). The motion became fully briefed and ripe for review when Defendant filed its reply brief on May 26, 2020. (Dkt. #37).

On May 29, 2020, Plaintiffs filed a motion pursuant to Federal Rule of Civil Procedure 21 for leave to add Kari Garber as a party plaintiff to a proposed Amended Complaint, with a supporting memorandum and declaration. (Dkt. #38-40). Plaintiffs submitted a corrected memorandum in support of their motion on June 12, 2020. (Dkt. #45). On June 22, 2020, Defendant filed its response to the motion and in support of its cross-motion to set a responsive pleading deadline upon disposition of the pending motion to compel arbitration. (Dkt. #48). On June 26, 2020, the Court granted both Plaintiffs' motion to add Kari Garber as a party plaintiff and Defendant's cross-motion for an extension of time to file its responsive pleading. (Dkt. #54). Plaintiffs filed their Amended Complaint on July 6, 2020. (Dkt. #55).

## DISCUSSION

### A.   Applicable Law

The FAA "reflects a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citations omitted). Section 2 of the FAA provides that "[a] written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save

upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA allows a party to such an agreement to petition a district court for an order compelling arbitration where a counterparty "fail[s], neglect[s], or refus[es] ... to arbitrate" under the terms of an arbitration agreement. *Id.* § 4. A court ruling on a petition to compel arbitration must decide two issues: [i] whether the parties agreed to arbitrate, and, if so, [ii] whether the scope of that agreement encompasses the claims at issue. *See Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015).

A court resolving a motion to compel arbitration applies a standard similar to that for summary judgment. *Meyer*, 868 F.3d at 74 (quoting *Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). In doing so, "the court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.* (internal quotation marks, alterations, and citations omitted). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala.* v. *Randolph*, 531 U.S. 79, 91 (2000). A party opposing arbitration may not satisfy this burden through "general denials of the facts on which the right to arbitration depends"; in other words, "[i]f the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing

that there is a dispute of fact to be tried." *Oppenheimer & Co.* v. *Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

In accordance with the "strong federal policy favoring arbitration as an alternative means of dispute resolution," a court must resolve any doubts concerning the scope of arbitrable issues "in favor of arbitrability." *Daly* v. *Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *New York* v. *Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996)), *cert. denied*, 140 S. Ct. 1117, 206 L. Ed. 2d 185 (2020). In so doing, courts "will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (internal quotation marks and citation omitted).

**B.   Analysis**

As previously mentioned, courts ruling on a motion to compel arbitration typically must determine both whether there is a valid agreement to arbitrate and whether the claims at issue fall within the arbitration provision at issue. *See Holick*, 802 F.3d at 394. However, Plaintiffs "do not here challenge the existence of an agreement to arbitrate." (Pl. Opp. 10 n.6). Therefore, the dispositive question is whether this dispute falls within the scope of the DAA's arbitration provision. For the reasons stated below, the Court finds that this dispute does so fall.

1.  **The DAA's Arbitration Provision Is Broad, and Therefore Creates a Presumption of Arbitrability**

As just noted, the Second Circuit has held that "the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Holick*, 802 F.3d at 395 (quoting *Smith/Enron Cogeneration Ltd. P'ship* v. *Smith Cogeneration Int'l*, 198 F.3d 88, 99 (2d Cir. 1999)). The first question, then, is whether the DAA's arbitration provision is sufficiently broad so as to create a presumption of arbitrability. *See Getz* v. *Verizon Commc'ns*, No. 18 Civ. 4652 (DLC), 2018 WL 5276246, at *2 (S.D.N.Y. Oct. 24, 2018) (explaining that "[t]he first step in [the] analysis is to classify the Arbitration Clause as either narrow or broad").[2]

In determining whether the DAA's arbitration provision is broad or narrow, the Court must determine whether "the language of the clause, taken

---

2   Plaintiffs argue that, rather than discerning whether the arbitration provision's language is broad or not, the proper threshold question is "whether the language of the DAA's arbitration provision is ambiguous." (Pl. Opp. 14). For this proposition, Plaintiffs rely on *Lloyd* v. *J.P. Morgan Chase & Co.*, wherein the Second Circuit explained that courts "apply a 'presumption of arbitrability' if the 'arbitration agreement is ambiguous as to whether it covers the dispute at hand.'" 791 F.3d 265, 269 (2d Cir. 2015) (quoting *Granite Rock Co.* v. *Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010)). Plaintiffs are correct that there is a presumption of arbitrability where the agreement is ambiguous as to whether the claims at issue fall within the relevant arbitration, but that presumption does not displace the similar presumption that accompanies the existence of a broad agreement to arbitrate, and *Lloyd* does not suggest otherwise. Indeed, *Lloyd* is irrelevant to the Court's analysis here because the Second Circuit did not confront a broad agreement to arbitrate in that case. *See id.* at 268 (dealing with a clause that only required arbitration of those claims that required arbitration under the FINRA Rules). Moreover, the Second Circuit has affirmatively noted that *Lloyd*'s language did not weaken or in any way alter the presumption of arbitrability that accompanies the existence of a broad agreement to arbitrate. *See Holick* v. *Cellular Sales of N.Y., LLC*,

11

as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause or if, on the other hand, arbitration was designed to play a more limited role."  *Louis Dreyfus Negoce S.A.* v. *Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001).

Here, the language of the DAA's arbitration provision is indisputably broad.  The DAA states, *inter alia*, that "*any dispute relating in any way* to your account or transactions will be resolved by binding arbitration"; that "*ALL DISPUTES*, EXCEPT AS STATED BELOW, MUST BE RESOLVED BY BINDING ARBITRATION*"; that "[c]laims and disputes … about your deposit account, transactions involving your deposit account, safe deposit box, and *any related service* with us are subject to arbitration"; and that "[*a*]*ny* claims or disputes *arising from or relating to* this agreement … are included."  (Deck Decl., Ex. C at 26 (emphases added)).  The Second Circuit has consistently construed similar language as broad.  *See, e.g.*, *Gaul* v. *Chrysler Fin. Servs. Ams. LLC*, 657 F. App'x 16, 17 (2d Cir. 2016) (summary order) (explaining how an arbitration agreement containing language that "any claim or dispute … which arises out of or relates to [the] Lease or any resulting transaction or relationship arising out of [the] Lease shall" was broad); *Holick*, 802 F.3d at 394 ("[T]he arbitration clause at issue here is broad because it applies to '[a]ll claims, disputes, or

---

802 F.3d 391, 395 n.7 (2d Cir. 2015) (noting that the Second Circuit still requires a "positive assurance to rebut the presumption of arbitrability," and characterizing *Lloyd*'s discussion of the presumption as dicta).  Therefore, in accordance with Second Circuit precedent, the proper threshold question is whether there exists a broad agreement to arbitrate.  Insofar as Plaintiffs suggest otherwise, they are wrong.

12

controversies arising out of, or in relation to this document or Employee's employment.'"); *see also Getz*, 2018 WL 5276246, at *2 (finding that a clause covering "any dispute that in any way relates to or arises … from any equipment, products, or services you receive from [Verizon]" was "sufficiently broad to create a strong presumption of arbitrability"). There is therefore little question that the arbitration provisions at issue in the instant motion are sufficiently broad to create a strong presumption of arbitrability.

### 2. The Allegations Underlying the Claims in This Action Touch Matters Covered by the DAA's Arbitration Provision

The characterization of the language in the DAA's arbitration provision as broad is significant, because it means that even collateral issues — that is, issues "*related to* but not facially covered by the arbitrable subject matter — should be arbitrated." *Ji Dong Cheng* v. *HSBC Bank USA, N.A.*, — F. Supp. 3d —, No. 20 Civ. 1551 (BMC), 2020 WL 3165214, at *4 (E.D.N.Y. June 15, 2020). However, as the Second Circuit has noted, the FAA's liberal policy in favor of arbitration is limited by the principle that "arbitration is a matter of consent, not coercion." *Holick*, 802 F.3d at 395 (quoting *JLM Indus., Inc.* v. *Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004)). In construing an arbitration clause, "courts … must give effect to the contractual rights and expectations of the parties. In this endeavor, as with any other contract, the parties' intentions control." *Id.* (quoting *Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)). It is therefore a court's responsibility to analyze the factual allegations undergirding a plaintiff's claims. *See id.* "If the allegations underlying the claims touch matters covered by the parties' [ ]

13

agreements, then those claims must be arbitrated, whatever the legal labels attached to them." *Id.* (quoting *Smith/Enron*, 198 F.3d at 99) (internal ellipses omitted).

Turning to Plaintiffs' allegations, it is clear that, at minimum, they touch matters covered by the DAA's arbitration provision. Plaintiffs' claims are based on Defendant's alleged illegal handling of various cashier's checks that each individual purchased from Defendant, using funds from their respective accounts with Defendant. (*See* Compl. ¶¶ 11-12; Villarreal Decl. ¶ 4). Thus, Plaintiffs' claims, regardless of their legal theory, constitute a "claim or dispute[ ] ... about [their] deposit account, transactions involving [their] deposit account, ... and any related service" (Deck Decl., Ex. C at 26), and fall within the scope of the DAA's arbitration provision. Indeed, as Defendant notes, "[t]his case never arises but for Plaintiffs using their accounts to purchase the cashier's checks central to the dispute." (Def. Reply 5).

Plaintiffs raise a host of objections, none of which is persuasive. For example, Plaintiffs argue that their claims are about Defendant's failure to abide by its obligations under various escheatment laws, not about Defendant's conduct in relation to Plaintiffs' acquisition of the Checks. (*See* Pl. Opp. 16-17). However, the DAA's arbitration provision does not limit itself to claims challenging the lawfulness of cashier's check transactions; it covers "any dispute relating in any way" to Plaintiffs' accounts or transactions. (Deck

14

Decl., Ex. C at 26).³ Plaintiffs are thus reading into the DAA a limitation that does not, in fact, exist.

Plaintiffs also attempt to argue that, because cashier's checks are paid out from a bank's own resources, as opposed to from the purchaser's account, the Checks, once purchased, ceased to have any connection with Plaintiffs' respective deposit accounts. (*See* Pl. Opp. 17-19). Thus, the Court understands Plaintiffs to argue, the DAA's arbitration provision cannot cover their escheatment-related claims because there is a temporal and financial disconnect between the Checks and Plaintiffs' deposit accounts with Defendant. (*See id.*). Plaintiffs cite no authority to support this particular proposition. Moreover, Plaintiffs' argument conveniently ignores again the broad nature of the DAA's arbitration provision. The arbitration provision covers any claim or dispute about Plaintiffs' deposit accounts, transactions involving their deposit accounts, and any related service. (*See* Deck Decl., Ex. C at 26; *id.*, Ex. D at 19-20). It is irrelevant that the funds for the Checks would not eventually be drawn from Plaintiffs' deposit accounts; what is important is that Plaintiffs used their respective accounts to purchase the

---

3       Plaintiffs rely on *Painter* v. *Turing Pharms., LLC*, No. 17 Civ. 7558 (CBA) (LB), 2019 WL 8163180 (E.D.N.Y. Sept. 27, 2019), but that case is inapposite here. In *Painter*, the court found that a securities fraud claim — based on allegations that the plaintiff's employer induced him to make certain investments — had nothing to do with the employer/employee relationship between the parties, and therefore was not subject to an arbitration clause covering "disputes arising out of or related to the employment relationship." *See id.* at *6-7. Here, Plaintiffs' claims clearly fall within the DAA's arbitration provision because they originate from Plaintiffs' purchases of cashier's checks using their respective accounts with Defendant. (*See* Compl. ¶¶ 11-12; Villarreal Decl. ¶ 4).

Checks. Thus, claims relating to those Checks fall within the scope of the arbitration provision.

Moving beyond the language of the DAA at issue, Plaintiffs assert that courts, in their analyses of the scope of arbitration agreements, consider whether the dispute at issue was foreseeable at the time of contracting. (*See* Pl. Opp. 20-21). For this assertion, Plaintiffs rely on four cases, only one of which comes from the Second Circuit and therefore can stand as binding authority. (*See id.*). However, that case — *Leadertex, Inc.* v. *Morganton Dyeing & Finishing Corp.*, 67 F.3d 20 (2d Cir. 1995) — does not stand for the proposition that a claim must have been foreseeable at the time of forming the arbitration agreement. Instead, the case stands for the unremarkable proposition that "[a]s with any contractual matter," a court's primary obligation in determining the scope of an arbitration provision is to "enforce the parties' reasonable expectations." *See id.* at 28-29.

Even if the Court were to conflate the concepts of contracting expectations and foreseeability, *Leadertex* is still inapposite. In that case, the defendant allegedly defamed the plaintiff by stating that the plaintiff was, *inter alia*, dishonest, in the practice of selling defective goods, and guilty of an attempt to defraud a third party. *See Leadertex*, 67 F.3d at 28. The Second Circuit held that the plaintiff's defamation claims, arising from those statements, were so attenuated from the parties' contract to provide dyeing and warehousing services that the parties could not have reasonably expected for the arbitration clause in their contract — which covered "[a]ny controversy or

16

claim arising under or in relation to" the contract — to have covered such claims. *See id.* at 27, 28-29. The *Leadertex* Court's holding rested, in part, on the fact that the defamatory statements did not in any way relate to the contract between the parties or any of the services provided under that contract. *See id.* at 28-29. Here there is no such attenuation between the claims at issue and the DAA. Plaintiffs' escheatment-related claims necessarily derive from Plaintiffs' purchases of the Checks using their accounts with Defendant, and both parties could have reasonably expected that a dispute relating to those Checks would fall within the DAA's arbitration provision.

Finally, Plaintiffs argue that the arbitration provision cannot cover this dispute because the dispute could have arisen even if Plaintiffs had not held deposit accounts with Defendant. (*See* Pl. Opp. 22). Similarly to their previous challenge, Plaintiffs cite to no cases that have any precedential value to this Court. (*See id.* (citing to cases from the Fifth Circuit, the Ninth Circuit, the Eleventh Circuit, and the Eastern District of New York)). And indeed, even assuming that the circuit cases to which Plaintiffs cite establish such a test for arbitrability, the Second Circuit has established no such test.[4] This is

---

[4] The Court also does not believe that these circuit cases uniformly establish such a test. *United States ex rel. Welch* v. *My Left Foot Children's Therapy, LLC*, 871 F.3d 791, 799 (9th Cir. 2017), and *Jones* v. *Halliburton Co.*, 583 F.2d 228, 240 (5th Cir. 2009), do discuss the significance that a third party who had not entered into the underlying agreement would have been able to bring the same claims against the defendant, but both cases deal with the specific issue of how directly related *qui tam* False Claims Act ("FCA") claims and sexual assault claims, respectively, were to the plaintiff's status as an employee. *Telecom Italia, SpA* v. *Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001), on the other hand, focuses on whether "[d]isputes ... are ... related — with at least some directness — to performance of duties specified by the [underlying] contract." Insofar as any of the above three cases discusses the

therefore not enough to create "a positive assurance" that the DAA's arbitration provision "is not susceptible of an interpretation that covers the asserted dispute," *Holick*, 802 F.3d at 395, and the presumption in favor of arbitrability remains in force.

In sum, Plaintiffs and Defendant are parties to a contract that includes a broad arbitration agreement. (*See generally* Deck Decl., Ex. C, D). Specifically, that broad agreement covers all claims and disputes about Plaintiffs' deposit accounts, transactions involving their deposit accounts, and any related services with Defendant. (*See id.* at 26). The existence of that broad agreement "creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Holick*, 802 F.3d at 395 (quoting *Smith/Enron*, 198 F.3d at 99). Despite Plaintiffs' best efforts to separate their claims from the DAA, they have failed to provide positive assurance that the DAA's arbitration provision does not cover a dispute arising from the mishandling of Checks purchased via Plaintiffs' respective deposit accounts. Moreover, even if Plaintiffs' claims were not directly covered by the DAA's arbitration provision — and the broad language of the agreement indicates that they likely are — even collateral issues should be arbitrated where there is a broad agreement. *See Ji Dong Cheng*, 2020 WL 3165214, at *4. Accordingly, Dill's and Appleby's claims must be submitted to arbitration

---

significance of a third party being able to bring similar claims, the Court reads that discussion as an analytical shorthand for establishing directness, as opposed to a clear test rooted in the holding of those cases.

as required by the DAA, and this action, as it relates to Dill and Appleby, is stayed pending arbitration.

## CONCLUSION

For the reasons stated in this Opinion, Defendant's motion to compel arbitration is GRANTED.  The Clerk of Court is ORDERED to terminate the motion at docket entry 17 and to STAY this case solely as to Plaintiffs Dill and Appleby.  The parties are ORDERED to update the Court on or before **January 29, 2021**, regarding the status of any arbitration.  The Court ORDERS Defendant to answer, move, or otherwise respond to Plaintiff Kari Garber's claims on or before **August 19, 2020**.

SO ORDERED.

Dated: July 29, 2020
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge